# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-06-00656-CR

**Juan Andino Figueroa a/k/a Juan Andino, Appellant**

**v.**

**The State of Texas, Appellee**

## FROM THE DISTRICT COURT OF BELL COUNTY, 27TH JUDICIAL DISTRICT
## NO. 56905, HONORABLE JOE CARROLL, JUDGE PRESIDING

## O P I N I O N

A jury convicted appellant Juan Andino Figueroa of the offense of possession of cocaine with intent to deliver an amount of four grams or more but less than 200 grams. *See* Tex. Health & Safety Code Ann. §§ 481.002(38), 481.112(a), (d) (West 2003). After the jury found true an enhancement paragraph alleging a prior felony conviction for aggravated robbery, punishment was assessed at 99 years' imprisonment and a $10,000 fine. In thirteen issues on appeal, appellant (1) challenges the sufficiency of the evidence; (2) contends that the district court erred in refusing to require the State to elect the transaction on which it would rely for conviction; (3) asserts that the district court abused its discretion in overruling his motion to suppress; (4) claims ineffective assistance of counsel; (5) asserts that the district court abused its discretion in denying him the right to represent himself during the presentation of his pretrial motion to quash the indictment; and

(6) argues that the district court erred in ordering him to pay court costs, attorney's fees, fines, and restitution as a condition of parole. We modify the judgment and, as modified, affirm.

**BACKGROUND**

The jury heard evidence that in May 2004, the Central Texas Narcotics Task Force was investigating two suspected drug dealers in the city of Killeen, Alberto Figueroa and Juan Figueroa.[1] The officers involved in the investigation who testified at trial were Detectives Anthony Lawrence, John Moseley, Alex Gearhart, and Joe Wadley, all with the Killeen Police Department Organized Crime Section. Detective Lawrence testified that Alberto and appellant first became suspects based on information obtained from two confidential informants. Lawrence testified that Alberto was the initial target of the investigation and that appellant "had kind of been a part of [the investigation] and was going to be a target later." Lawrence had received information from one of his informants that Alberto usually went out of town with appellant "to pick up the dope and bring it back to Killeen." Based on this information, Lawrence planned what is known as a "buy-bust" operation in order to apprehend Alberto.

In the late morning and early afternoon hours of May 7, 2004, beginning at approximately 11:30 a.m., Detective Lawrence and Detective Moseley conducted surveillance on an apartment located at 2807 Cantabrian Street where appellant allegedly resided. According to Lawrence, at some point during the approximately two hours that the detectives were observing the apartment, they saw Alberto arrive at the location in a gold or tan Toyota Camry while appellant was

---

[1] Alberto Figueroa and Juan Figueroa are not related. To avoid confusion, we will refer to Alberto Figueroa as "Alberto" and Juan Figueroa as "appellant."

out in the front of the residence washing a white Lincoln. Lawrence testified that he observed appellant get into Alberto's vehicle and drive away. Based on information that he had obtained during his investigation, Lawrence believed that the suspects were headed to the Dallas area to obtain narcotics.[2] Lawrence and other officers attempted to follow the suspects out of Killeen, but lost them at some point during the pursuit. The suspects were not seen again until that night.

Alberto testified as an accomplice witness for the State.[3] Alberto testified that he met appellant about four to six months prior to May 2004, and that they had made plans to "sell coke." Alberto testified that on the morning of May 7, appellant called Alberto and told him that he "was about to go into Dallas, pick up some dope." Alberto agreed to go with him. When asked to explain their plan, Alberto testified, "We were just going to Dallas, get the coke and come back and sell it." Alberto testified that he and appellant drove together to a location in Dallas to purchase the cocaine. Once they arrived at the location, Alberto recounted, appellant purchased the cocaine while Alberto waited in the car. They then drove back to Killeen. Alberto further testified that he already had a buyer for the cocaine (who turned out to be an informant) and that he and appellant called the buyer on their way back to Killeen to set up a meeting time. The plan, according to Alberto, was for

[2] Although Detective Lawrence was not allowed to testify directly as to exactly where the informant told him the suspects would be traveling (because of a hearsay objection by defense counsel), the State nevertheless indirectly elicited this information from Lawrence by asking him approximately how long it would take "to drive to Dallas from Killeen." Without objection from defense counsel, Lawrence testified, "Depend[s] upon traffic. I myself travel that anywhere from 2-1/2 hours to 3-1/2 hours." On cross-examination, however, Lawrence admitted that the time frame he specified could be consistent with traveling from Killeen to San Antonio or even going to see a movie. Defense counsel also elicited an admission from Lawrence that whatever happened during the time in which the suspects were unaccounted for was "purely speculative."

[3] Because of Alberto's alleged involvement in the offense, the district court instructed the jury on the law of parties.

3

Alberto to sell the cocaine to the buyer for $1100, and Alberto would give appellant $1000 when he saw him later that night and keep $100 for himself. Alberto explained further, "[a]fter we got back [to] Killeen, we went to my apartment. We made some phone calls, and then we just cut [the cocaine] up and went our separate ways."

At approximately 8:00 p.m., the "buy-bust" operation commenced in the parking lot of a Target store in Killeen. Using a wired informant, Detective Lawrence was able to listen to conversations between the informant and Alberto that led Lawrence to believe that a drug transaction was taking place. Officers subsequently arrested Alberto at the scene. Appellant was not with Alberto at the time of Alberto's arrest. Detective Moseley, who was present during the arrest, testified that Alberto was in possession of more than 100 grams of cocaine. However, this amount was less than what the detectives were expecting to find based on the information they had received, so Lawrence directed Moseley and other officers to continue the investigation while Lawrence processed the evidence obtained during Alberto's arrest.

Following Alberto's arrest, Detective Wadley resumed surveillance at the apartment in an attempt to locate appellant. At approximately 9:45 p.m., Wadley observed a white Lincoln that he believed belonged to appellant leave the residence. In an unmarked vehicle, Wadley followed the Lincoln at a distance to avoid detection, and Detective Moseley and another officer soon joined pursuit, also traveling in unmarked vehicles. The Lincoln eventually pulled into a parking lot at a location Wadley believed to be Alberto's residence, and the officers parked behind the Lincoln. When Wadley exited his car, appellant "put his vehicle in gear," "jumped the curb," and "headed back out" to the road. The officers resumed pursuit, this time joined by a marked patrol vehicle, and

4

stopped appellant shortly thereafter. Both appellant and the passenger in his vehicle, Marilyn Muriel,[4] were arrested on outstanding warrants.[5] In searches incident to the arrests, no cocaine was found on appellant's person or inside the vehicle. However, on the ground outside the vehicle in an area where Muriel had been standing when she first exited the vehicle, the officers found a package containing what appeared to be cocaine residue, and they also found approximately $2900 in cash and less than one gram of cocaine in Muriel's purse after she and appellant were transported to the police station.[6]

While appellant was in custody, surveillance continued at his residence. At approximately 10:40 p.m., Detective Gearhart observed a maroon Ford Contour pull into the parking lot. Gearhart testified that two women exited the vehicle and entered the apartment. Over his police radio, Gearhart informed Detective Moseley of this development, and, approximately five minutes later, Moseley returned to the apartment. The two detectives approached the apartment, knocked on the door, and were greeted by Luz Cruz, who identified herself as appellant's girlfriend.[7] Moseley advised Cruz of appellant's arrest and asked her if he could come inside and speak with her about

---

[4] It is unclear from Detective Wadley's testimony whether Muriel was a passenger in the vehicle from the beginning, or if appellant picked her up at an address "right around the corner" from his residence before traveling to Alberto's residence.

[5] As will be described in more detail below when discussing appellant's motion to suppress, appellant's arrest warrant was actually for another man who had been using appellant's identity.

[6] Moseley testified that it was not unusual for dealers to pass drugs or money to passengers in vehicles, particularly female passengers, because male law enforcement officers are generally hesitant to conduct a personal search of a female.

[7] The other female in the apartment at the time of the search was identified as Carmen Rivera. The record reflects that the detectives did not suspect either female of being involved with the criminal activity.

the circumstances of the arrest. Moseley testified that Cruz gave him permission to enter the apartment and, shortly thereafter, consent to search the apartment.[8]

Detective Moseley testified that during the search of the apartment, the detectives found a small plastic packet that contained what appeared to be cocaine near the walkway outside the front door and a "small amount" of a white powder substance on the kitchen counter. Also found inside the residence were digital scales, which Moseley testified could be used to weigh quantities of cocaine for distribution purposes, and a yellow Ziploc packet containing cocaine found underneath a couch cushion. In one of the bedrooms, the detectives found "[m]ore than 90 grams" of cocaine underneath the bed and, in the closet, a small plastic packet that contained a residual amount of cocaine. Moseley testified that the cocaine found underneath the bed "was packaged inside a gallon Ziploc bag with three individual separate plastic containers inside that bag." Near the bed, the detectives found a pair of men's tennis shoes and, on the bed, men's clothing. The detectives also found in the bedroom a "Western Union money gram ticket" with appellant's signature written on it. Moseley explained that this was significant to the investigation because it indicated to him that appellant "kept his documents and personal papers in that bedroom." Other items found in the bedroom included a prescription medicine bottle with appellant's name on it, a credit card with appellant's name on it, and "some type of work order [] made out to the name of" appellant. When asked about the significance of these items, Moseley testified that they "establish that that's where the suspect resides, that's where he keeps his personal records and valuables and medications, things

---

[8] The circumstances surrounding Cruz's consent to search will be described when we discuss appellant's motion to suppress.

that he needs on a daily basis." Detective Moseley testified that, largely because of the quantity of cocaine that was seized at the residence, he believed the cocaine was "[p]ossessed to be distributed." Detective Gearhart also testified that the cocaine found in the apartment was "definitely a distribution amount of cocaine."

An issue raised by appellant during trial was whether another man, Luis Urbano, also lived at the apartment. Robert Harrell, a private investigator and bail bondsman, testified that Urbano was a party to the residential lease agreement. A realtor connected to the apartment property testified that Luis Urbano and Luz Cruz were both listed as "tenants" on the lease. The realtor further testified that appellant was listed on the lease as an "occupant" of the apartment. On cross-examination, the realtor explained that only Cruz signed the lease; Urbano's and appellant's signatures and initials were not on the document. The realtor also testified that appellant was "not a party" to the lease and that she had no personal knowledge of whether appellant lived in the apartment.

The State called Kathleen Nickerson to testify about appellant's living arrangements. Nickerson was identified to the jury as an employee of the State of Texas who, through her job responsibilities, knew appellant, where he lived, and with whom he lived.[9] Nickerson testified that on March 1, 2004, appellant updated his address with her. Nickerson explained that the address

_____

[9] Nickerson also testified that the people with whom she came into contact through her employment were required to inform her if they planned on "moving out anytime soon." Counsel acknowledged, outside the presence of the jury, that Nickerson was appellant's parole officer. Appellant's counsel moved for a mistrial based on "the inference" from Nickerson's testimony that appellant had a prior conviction. The district court denied appellant's motion for mistrial, and appellant does not complain of this ruling on appeal.

7

appellant gave her was 2807 Cantabrian Drive, Apartment D in Killeen and that appellant continued to live at that address in April and early May 2004. Nickerson also testified that appellant lived at the apartment with Luz Cruz and that appellant did not indicate to her that there were any other adults living in the apartment. Nickerson also visited appellant at this address. She testified that when she visited the apartment, she did not see any other adults living at the residence other than appellant and Cruz.

Detective Gearhart testified that when he searched the apartment, there was no indication that any adult male lived there other than appellant. Additionally, Detective Moseley testified that when he interviewed Cruz upon his arrival at the apartment, Cruz did not indicate that anyone other than herself and appellant lived at the apartment.

On October 20, 2004, appellant was indicted for knowingly and intentionally possessing with intent to deliver a controlled substance, namely cocaine, in an amount of four grams or more but less than 200 grams. The indictment also contained an enhancement paragraph alleging that appellant had been convicted of the offense of aggravated robbery on January 19, 1982. The jury found appellant guilty as charged in the indictment and also found the enhancement paragraph to be true. Punishment was assessed at 99 years' imprisonment and a $10,000 fine.

Following his conviction, appellant filed a motion for new trial, and the district court granted appellant an evidentiary hearing on the motion. The primary issue at the hearing, during which appellant's trial counsel testified, was whether counsel rendered ineffective assistance during the course of the trial. The motion for new trial was overruled by operation of law.

8

On December 2, 2005, appellant filed his notice of appeal. On January 5, 2006, this Court found that appellant failed to timely file his notice of appeal and, therefore, dismissed the appeal for want of jurisdiction. *Figueroa v. State*, No. 03-05-00803-CR (Tex. App.—Austin Jan. 5, 2006) (mem. op., not designated for publication). Subsequently, appellant filed a writ of habeas corpus with the court of criminal appeals, alleging that counsel was ineffective in failing to timely file his notice of appeal. The court of criminal appeals agreed and found that appellant was entitled to file an out-of-time appeal. *See Ex Parte Figueroa*, No. AP-75,504 (Tex. Crim. App. 2006). This appeal followed.

## DISCUSSION

On December 12, 2006, this Court granted in part appellant's motion to file a pro se brief. *Figueroa v. State*, No. 03-06-00656-CR (Tex. App.—Austin Dec. 12, 2006) (order). We allowed appellant to file a pro se brief in addition to, but not in lieu of, the brief filed by his attorney. *Id*. Because both appellant and his attorney have filed briefs with this Court, we have two sets of issues to consider.[10] Issues one through eight were argued pro se by appellant. Issues nine through thirteen were argued by counsel.

**Evidentiary sufficiency**

In his first and second issues, appellant challenges the legal and factual sufficiency of the evidence supporting his conviction. When there is a challenge to the legal sufficiency of the

---

[10] In the brief filed by appellant's counsel, counsel addresses appellant's pro se issues and discusses why he has chosen not to adopt them. Counsel states that he has "thoroughly reviewed appellant's arguments and nevertheless has chosen not to adopt them."

evidence to sustain a criminal conviction, we consider whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Vodochodsky v. State*, 158 S.W.3d 502, 509 (Tex. Crim. App. 2005). We review all the evidence in the light most favorable to the verdict and assume that the trier of fact resolved conflicts in the testimony, weighed the evidence, and drew reasonable inferences in a manner that supports the verdict. *See Rollerson v. State*, 227 S.W.3d 718, 724 (Tex. Crim. App. 2007); *Shams v. State*, 195 S.W.3d 346, 347 (Tex. App.—Austin 2006, pet. ref'd) (citing *Griffin v. State*, 614 S.W.2d 155, 159 (Tex. Crim. App. 1981)). It is not necessary that every fact point directly and independently to the defendant's guilt, but it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). We must consider all the evidence, rightly or wrongly admitted, that the trier of fact was permitted to consider. *See Conner v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001).

In a factual sufficiency review, we view the evidence in a neutral light and ask whether a jury was rationally justified in finding guilt beyond a reasonable doubt. *See Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006). We then determine whether the evidence supporting the verdict is so weak that the verdict is clearly wrong and manifestly unjust or whether the verdict is against the great weight and preponderance of the conflicting evidence. *Id.* at 415. We will not reverse a case on a factual sufficiency challenge unless we can say, with some objective basis in the record, that the great weight and preponderance of the evidence contradicts the jury's verdict. *Id.* at 417.

The elements for possession of a controlled substance with intent to deliver are that the defendant: (1) possessed a controlled substance in the amount alleged; (2) intended to deliver the controlled substance to another; and (3) knew that the substance in his possession was a controlled substance. Tex. Health & Safety Code Ann. §§ 481.002(38), 481.112(a); *see Nhem v. State*, 129 S.W.3d 696, 699 (Tex. App.—Houston [1st Dist.] 2004, no pet.). Appellant contests the element of possession, arguing that there is insufficient evidence connecting him to the drugs that were found in the apartment.

When the accused is not in exclusive possession of the place where the substance is found, his knowledge of and control over the contraband cannot be established unless there are additional independent facts and circumstances which link him to the contraband. *Poindexter v. State*, 153 S.W.3d 402, 406 (Tex. Crim. App. 2005). Whether the State's evidence linking a defendant to the contraband in question is direct or circumstantial, it must establish, "to the requisite level of confidence, that the accused's connection with the drug was more than just fortuitous." *Id*. at 405-06 (citing *Brown v. State*, 911 S.W.2d 744, 747 (Tex. Crim. App. 1995)). There are many factors by which a defendant may, under the unique circumstances of each case, be sufficiently "linked" to the contraband, including: (1) the defendant's presence when a search is conducted; (2) whether the contraband was in plain view; (3) the defendant's proximity to and the accessibility of the contraband; (4) whether the defendant was under the influence of contraband when arrested; (5) whether the defendant possessed other contraband or narcotics when arrested; (6) whether the defendant made incriminating statements when arrested; (7) whether the defendant attempted to flee; (8) whether the defendant made furtive gestures; (9) whether there was an odor of contraband;

11

(10) whether other contraband or drug paraphernalia were present; (11) whether the defendant owned or had the right to possess the place where the drugs were found; (12) whether the place where the drugs were found was enclosed; (13) whether the defendant was found with a large amount of cash; and (14) whether the conduct of the defendant indicated a consciousness of guilt. *Id*. at 162 n.12. However, "[t]hese are simply some factors which may circumstantially establish the legal sufficiency of the evidence to prove a knowing 'possession.' They are not a litmus test." *Id*. Furthermore, it is not the number of links that is dispositive, but rather the logical force of all the evidence, direct and circumstantial. *Id*. at 162. The force of these links need not be such as to exclude every other alternative hypothesis except the defendant's guilt. *Brown*, 911 S.W.2d at 748.

In evaluating the sufficiency of the evidence, an appellate court must consider all the evidence in the record, including accomplice testimony. *McDuff v. State*, 939 S.W.2d 607, 614 (Tex. Crim. App. 1997). However, a conviction cannot stand on accomplice testimony unless it is corroborated by other evidence tending to connect the defendant with the offense. Tex. Code Crim. Proc. Ann. art. 38.14 (West 2005). To corroborate accomplice testimony, "the reviewing court eliminates all of the accomplice testimony from consideration and then examines the remaining portions of the record to see if there is any evidence that tends to connect the accused with the commission of the crime." *Castillo v. State*, 221 S.W.3d 689, 691 (Tex. Crim. App. 2007) (citing *Solomon v. State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001)). "The corroborating evidence need not be sufficient by itself to establish guilt; there simply needs to be 'other' evidence 'tending to connect' the defendant to the offense." *Id*. In other words, "[t]he non-accomplice evidence does not have to directly link appellant to the crime, nor does it alone have to establish his guilt beyond

12

a reasonable doubt." *McDuff*, 939 S.W.2d at 613. "There must simply be *some* non-accomplice evidence which *tends* to connect appellant to the commission of the offense alleged in the indictment." *Castillo*, 221 S.W.3d at 691. Even apparently insignificant incriminating circumstances may provide sufficient corroboration. *Trevino v. State*, 991 S.W.2d 849, 852 (Tex. Crim. App. 1999).

There is non-accomplice evidence in the record which tends to connect appellant to the commission of the offense alleged in the indictment. Detective Moseley testified that more than 90 grams of cocaine was found in appellant's residence. Moseley testified that he believed the cocaine was "[p]ossessed to be distributed," and Detective Gearhart also testified that the cocaine found in the apartment was "definitely a distribution amount of cocaine." The cocaine was found underneath a bed in what the evidence suggests was appellant's bedroom. Appellant's personal belongings were found in the bedroom, including a prescription bottle, a credit card, and documents with appellant's name on them. Additionally, men's clothing and a pair of men's tennis shoes were found in the bedroom, and, according to the testimony of Moseley, Gearhart, and Kathleen Nickerson, appellant was the only male known to be living in the apartment.

Having found that Alberto's testimony was corroborated by other evidence in the record, we can proceed with our sufficiency analysis. In making its guilt-innocence determination, the jury considered the following evidence:

- Alberto testified that he entered into an agreement with appellant to go to Dallas, obtain cocaine, and sell it upon their return to Killeen. Alberto included in his testimony specific details about the agreement, including the plan to sell it to a specific buyer for $1100. Alberto was to receive $100, while appellant would receive the remainder of the money. Alberto also testified that "[a]fter we got back [to] Killeen, we went to my apartment. We made some phone calls, and then we just cut [the cocaine] up and went our separate ways."

13

- Detective Wadley testified that when appellant parked his vehicle at what Wadley believed to be Alberto's residence, and police vehicles parked behind him, appellant "put his vehicle in gear," "jumped the curb," and "headed back out" to the road. In other words, appellant attempted to flee.

- Detective Wadley testified that when appellant was arrested, there was no cocaine found on his person or in his vehicle. However, on the ground outside the vehicle in an area where appellant's passenger had been standing when she first exited the vehicle, the officers found a package containing what appeared to be cocaine residue, and they also found approximately $2900 in cash and less than one gram of cocaine in the passenger's purse after she and appellant were transported to the police station. Detective Moseley testified that it was not unusual for dealers to pass drugs or money to passengers in vehicles, particularly female passengers, because male law enforcement officers are generally hesitant to conduct a personal search of a female.

- As discussed above, more than 90 grams of cocaine was found in a bedroom at appellant's residence. Officers testified that this was a "large quantity" and "distribution amount" of cocaine. Appellant's personal belongings were in this bedroom, as were men's clothing and men's tennis shoes.

- There was additional contraband found at the residence, including a small plastic packet that contained cocaine near the walkway outside the front door, a "small amount" of cocaine on the kitchen counter, a yellow Ziploc packet containing cocaine found underneath a couch cushion, and a digital scale that Detective Moseley testified could be used to weigh quantities of cocaine for distribution purposes.

- Kathleen Nickerson testified that appellant lived at the residence and that she was aware of no one other than appellant and Cruz living at the residence. Detective Moseley testified that Cruz did not indicate that anyone other than herself and appellant lived at the residence. Detective Gearhart testified that when he searched the residence, there was no indication that any adult male lived there other than appellant.

- A man by the name of Luis Urbano was listed as a "tenant" on the apartment's residential lease agreement. However, this same lease agreement listed appellant as an "occupant."

We hold that the combined and cumulative force of the above evidence, when viewed in the light most favorable to the verdict, is legally sufficient to establish that appellant exercised care, custody, or control of the contraband. The apartment contained a large amount of contraband,

more than 90 grams of cocaine. *See Roberson v. State*, 80 S.W.3d 730, 740 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd) ("The amount of contraband found is a factor we can consider in determining if an affirmative link exists. The power of this factor can reasonably be expected to increase as the amount of drugs increases."). Most of the cocaine was found in a bedroom that also contained appellant's personal belongings. Detective Moseley testified that these personal items "establish that that's where the suspect resides, that's where he keeps his personal records and valuables and medications, things that he needs on a daily basis." The jury could have rationally concluded from this evidence that the cocaine found in the bedroom belonged to appellant. Additionally, the officers testified that they observed appellant at the residence while they were conducting surveillance earlier in the day, and appellant was listed as an "occupant" on the residential lease agreement. Also, there was testimony from several witnesses that appellant was the only male known to live at the residence, and the cocaine in the bedroom was found underneath the bed near men's clothing and men's tennis shoes. Other evidence from which the jury could have linked appellant to the cocaine include the other contraband found in the apartment, the accomplice testimony about the plan between Alberto and appellant to sell cocaine, and appellant's attempt to flee from the police prior to his arrest, a fact from which the jury could have inferred a consciousness of guilt.

When viewing the above evidence in a neutral light, we also conclude that the evidence is factually sufficient. Although Luis Urbano was listed as a "tenant" on the residential lease agreement, there was no other evidence from which the jury could have concluded that the cocaine belonged to Urbano and not appellant. Urbano was not seen at the apartment, no witness

15

testified that he lived at the apartment, and his personal belongings were not found in the apartment. As for the females found in the apartment, Luz Cruz and Carmen Rivera, the officers testified that neither of them were suspects in the criminal activity. Thus, there lacks an objective basis in the record for holding that the great weight and preponderance of the evidence contradicts the jury's verdict.

We overrule appellant's first and second issues.

In his third issue, appellant challenges the legal sufficiency of the evidence supporting the finding of true to the enhancement paragraph. Specifically, appellant claims that there was no evidence that his 1982 conviction for aggravated robbery was final.

At the punishment hearing, the State offered into evidence a penitentiary packet relating to appellant's previous conviction.[11] Appellant's counsel objected to the evidence, arguing that the State had "not proved up the finality of it on appeal." The district court overruled the objection. Later, after the jury retired for deliberations, the district court informed appellant's counsel that it would take "judicial notice" of the conviction's finality. Appellant's counsel objected to the district court's finding: "I understand the Court is taking judicial notice. We would object to the finding that it is a final conviction since that file is not here and the Court hasn't examined it. I understand the court is going to take judicial notice of everything that is in the file. We will object to that finding."

---

[11]   A pen packet is the file from the penitentiary where the defendant was an inmate and which contains the documents related to the inmate's prior conviction. *See Cuddy v. State*, 107 S.W.3d 92, 96 (Tex. App.—Texarkana 2003, no pet.). Appellant does not contest the authenticity of the documents in the pen packet.

16

As support for his argument that the State failed to prove the finality of his prior conviction, appellant relies on *Jones v. State*, 711 S.W.2d 634 (Tex. Crim. App. 1986). In *Jones*, the court of criminal appeals held that the "burden is on the State to make a prima facie showing that any prior conviction alleged for enhancement, or for punishing an accused as a repeat offender, became final before the commission of the primary offense, and once such a showing is made, the burden shifts to the defendant to prove otherwise." 711 S.W.2d at 635. The court added that "[t]he law is settled that a conviction from which an appeal has been taken is not considered to be a final conviction until the conviction is affirmed by the appellate court and that court's mandate of affirmance becomes final." *Id.* at 636.

In *Jones*, the State introduced into evidence the sentence from the prior conviction. *Id.* However, "[i]n doing so, [the State] also proved that the conviction was not a final conviction because the sentence clearly reflect[ed] that immediately after the appellant was sentenced, he 'then and there, in open court, excepted and gave notice of appeal to the Court of Criminal Appeals of the State of Texas, Austin, Texas.' It then became the State's further duty to show the final disposition of such appeal." *Id.* The court of criminal appeals found that the State did not satisfy this burden. *Id.*

*Jones* is inapplicable to this case. "*Jones* held merely that if the State's proof of the prior conviction shows on its face that the conviction was appealed, the State must put on evidence that mandate has issued." *Ex parte Chandler*, 182 S.W.3d 350, 358 (Tex. Crim. App. 2005) (citing *Beal v. State*, 91 S.W.3d 794, 797 (Tex. Crim. App. 2002) (Keller, P.J., concurring)). That is not

17

the situation here. Nothing on the face of the pen packet shows that appellant's conviction was appealed. Thus, the State had no burden to prove that mandate had issued.

As for appellant's assertion that it was impermissible for the district court to take "judicial notice" of the finality of the conviction, we also reject that contention. When faced with a silent record regarding whether a conviction is final, courts may presume finality. *See Fletcher v. State*, 214 S.W.3d 5, 8 (Tex. Crim. App. 2007) (citing *Johnson v. State*, 784 S.W.2d 413, 414 (Tex. Crim. App. 1990)); *see also Flowers v. State*, 220 S.W.3d 919, 921-22 (Tex. Crim. App. 2007). In this case, the State presented the district court with evidence of a conviction that had occurred 23 years earlier, there was nothing in the evidence presented to indicate that the conviction was not final, and appellant presented no evidence to overcome the presumption of finality. On this record, we hold that it was not an abuse of discretion for the district court to take judicial notice of the finality of appellant's 1982 conviction for aggravated robbery. *See* Tex. R. Evid. 201 (relating to judicial notice of adjudicative facts); *but see Fletcher*, 214 S.W.3d at 9 (holding that when State fails to make a prima facie showing of finality, appeals court may not "take judicial notice of a mandate, even if issued by that same court, where the State had the opportunity to introduce that mandate at the punishment phase. To do so would not only deprive a defendant of the opportunity to rebut the State's evidence, but would also allow the State to circumvent its burden at trial."); *Sherman v. State*, 750 S.W.2d 855, 856-57 (Tex. App.—Houston [14th Dist.] 1988, no pet.) (holding that trial court may not take judicial notice of conviction's finality "where the record reflects that the defendant gave notice of appeal of a prior conviction alleged for enhancement, but does not show the disposition of that appeal.").

18

We overrule appellant's third issue.

**Election**

In his fourth issue, appellant asserts that the district court erred in refusing to order the State to elect which transaction it would rely upon for conviction. Appellant contends that "there were two possible transactions" of which he could have been convicted of the offense charged in the indictment—the cocaine seized in appellant's apartment, and the cocaine seized in Alberto's car upon his arrest. The State responds that "both incidents were part and parcel of the same transaction" and, therefore, an election was not required.

At the close of the State's evidence, defense counsel requested that the district court order the State "to make an election as to the charge." Counsel explained:

> The charge is for cocaine at the house. There has been evidence put on about Mr. Alberto Figueroa's charge, the cocaine that was seized there. Mr. Juan Figueroa was not charged in that, but I would like—I'm requesting an election at this point to ensure that there is no confusion about what cocaine is charged . . . specifically which cocaine are we talking about. So I'm going to request an election at this time.

The State responded:

> Judge, I don't believe we need to make [an] election at this point. I mean, we know in sexual assault-related type offenses when you have different acts that are themselves crimes, you need to make an election if required to do so. However, what we have here is two men working together in a scheme.
>
> We heard from Alberto Figueroa. The only cocaine we have in evidence is the cocaine seized from the defendant's house. The only lab report we have in evidence is a lab report from the cocaine seized from the defendant's house. We have testimony from Alberto, the charges against him and his arrest. However, Alberto was working together with Juan, and testimony from Alberto was they brought the

19

cocaine back together from Dallas. We don't view them as separate offenses. We view them as just one continuing offense. And we have the law of parties in there as well talking about being responsible for certain things. So we don't believe we need to make an election at this point.

The district court denied appellant's motion to require the State to make an election, explaining its reasoning as follows:

. . . it appeared to me that the cocaine seized at the house was possessed and that the evidence regarding the other Figueroa selling was on the issue of intent to deliver. And that's the reason why I allowed the charge on parties. I felt like that if you just go into somebody's house and you find a bunch of cocaine, it may be for delivery, it may not be for delivery. But in this case there is evidence of delivery, you know, an accomplice.

"The trial court in its discretion may order the State to make its election at any time prior to the resting of the State's case in chief. However, once the State rests its case in chief, in the face of a timely request by the defendant, the trial court must order the State to make its election. Failure to do so constitutes error." *O'Neal v. State*, 746 S.W.2d 769, 772 (Tex. Crim. App. 1988). As the State observed, election is typically required in cases involving multiple instances of sexual misconduct. *See, e.g., Phillips v. State*, 193 S.W.3d 904, 912 (Tex. Crim. App. 2006); *Francis v. State*, 36 S.W.3d 121, 123-25 (Tex. Crim. App. 2000); *O'Neal*, 746 S.W.2d at 772. "The general rule is that where one act of intercourse is alleged in the indictment and more than one act of intercourse is shown by the evidence in a sexual assault trial, the State must elect the act upon which it would rely for conviction." *O'Neal*, 746 S.W.2d at 771. Requiring an election can serve four purposes: (1) to give notice to the defendant of the particular offense the State intends to rely on and afford the defendant an opportunity to defend; (2) to protect the defendant from the

20

introduction of extraneous offenses; (3) to minimize the risk that the jury might convict, not because one or more crimes were proved beyond a reasonable doubt, but because all of them together convinced the jury that the defendant was guilty; and (4) to ensure that the jurors unanimously agree that one specific incident constituting the offense alleged in the indictment occurred. *Phillips*, 193 S.W.3d at 910.

However, an election is not always required. No election is required "where the evidence shows that the several acts of intercourse were committed by one continuous act of force and threats." *Steele v. State*, 523 S.W.2d 685, 687 (Tex. Crim. App. 1975). For example, in *Steele*, the evidence showed that the defendant sexually assaulted the victim in a car, forced her at gunpoint to drive 20 miles to her apartment, and then sexually assaulted the victim in her apartment "some two hours after the first act of intercourse." *Id*. at 686. The court of criminal appeals held that no election was required because the evidence showed that the acts of intercourse, although separated by time and distance, "were occasioned by appellant's continuing and intervening actions" and "were part and parcel of the same criminal transaction." *Id*. at 687.

Neither appellant nor the State cite to any drug-possession cases involving election. However, the few cases we have found provide analysis consistent with the approach taken by the court in *Steele*. In *Powell v. State*, marihuana was found in the defendant's camper and, later, in his pants and coat pocket. 502 S.W.2d 705, 708 (Tex. Crim. App. 1973). The defendant claimed that the evidence showed two distinct acts of possession and that the State should have been required to make an election. The court of criminal appeals disagreed, holding that "[t]he offense committed was a continuous one and the evidence introduced is so related in point of time and place as to show

21

one continuous possession by appellant." *Id*. at 709.  In *Juarez v. State*, three co-defendants were found in possession of marihuana after leaving the defendant's place of business at different times during the day.  479 S.W.2d 945, 945-46 (Tex. Crim. App. 1972).  The defendant claimed that there was a separate act of possession for each time a co-defendant was found in possession of marihuana allegedly obtained from the defendant.  The court of criminal appeals disagreed, holding that "[t]he events which appellant claims are separate transactions are nothing more than circumstances tending to show that appellant possessed marihuana."  *Id*. at 947.  In *Long v. State*, the defendant was charged with unlawful possession of intoxicating liquor for purpose of sale in a dry county.  258 S.W.2d 818, 819 (Tex. Crim. App. 1953).  The State introduced evidence that the defendant possessed "separate loads of whiskey."  In holding that the State was not required to elect which "load" of whiskey it would rely for conviction, the court of criminal appeals explained,

> The whole transaction itself is not one involving the sale of alcoholic liquor but the charge is for the possession thereof for the purpose of sale; and the mere fact that there was more than one load of whiskey brought to [the location in question] would be but a circumstance to show that this whiskey was being stored there; and each bottle, while it may not have been utilized for the purpose of securing a conviction, nevertheless, the whole transaction taken together might be utilized but for one purpose and that was the offense of having whiskey in his possession for the purpose of sale.

*Id*. at 654 (emphasis added); *see also Sikes v. State*, 334 S.W.2d 440, 446 (Tex. Crim. App. 1960) (no election required where State presented evidence of possession of marihuana found in defendant's automobile and in defendant's apartment).

This case is similar to the above cases.  The evidence at trial showed that the cocaine seized during Alberto's arrest was not separate from the cocaine seized at appellant's apartment.

22

Rather, both quantities of cocaine were "part and parcel" of the same criminal transaction. Alberto testified that he and appellant drove to Dallas together to obtain the cocaine and returned to Killeen to sell the cocaine. Alberto also testified that "[a]fter we got back [to] Killeen, we went to my apartment. We made some phone calls, and then we just cut [the cocaine] up and went our separate ways." At approximately 8:00 p.m., Alberto was arrested attempting to sell some of that cocaine. Detective Moseley testified that the detectives found on Alberto less cocaine than what they were expecting to find based on the information they had received, so the detectives' operation continued. A few hours later, more cocaine was found in appellant's apartment. Thus, the evidence reflects one continuous transaction in which the cocaine found on Alberto and the cocaine found in appellant's apartment, although separated by time and distance, were both "occasioned by appellant's continuing and intervening actions" and "were part and parcel of the same criminal transaction." *See Steele*, 523 S.W.2d at 687. Appellant was charged with the offense of possession of cocaine with intent to deliver. The cocaine found in appellant's apartment was evidence that appellant possessed the cocaine. The cocaine found on Alberto, appellant's alleged accomplice in the crime, was evidence of appellant's intent to deliver the cocaine. As the district court observed in its ruling, this is why the jury was instructed on the law of parties.

On this record, we hold that the district court did not err in refusing to order the State to make an election. We overrule appellant's fourth issue.

**Motion to suppress**

In his fifth, sixth, and seventh issues, appellant argues that the district court abused its discretion in denying his motion to suppress the evidence seized from his apartment. In his fifth

23

and sixth issues, appellant asserts that Luz Cruz's consent to search the apartment was obtained by the "exploitation" of what appellant terms his "illegal arrest" and the "warrantless search and seizure" of the evidence at his apartment. In his seventh issue, appellant asserts that Cruz's written consent was executed after the search and seizure had already been conducted.[12] Appellant does not contend that Cruz lacked authority to consent to the search. *See Georgia v. Randolph*, 547 U.S. 103, 106 (2006) ("The Fourth Amendment recognizes a valid warrantless entry and search of premises when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant who later objects to the use of evidence so obtained.").

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Ford v. State*, 158 S.W.3d 488, 493 (Tex. Crim. App. 2005). The trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given to their testimony. *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We give trial courts almost complete deference in determining historical facts, but we review de novo the trial court's application of the law. *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000). When reviewing the trial court's ruling on a motion to suppress, we must view the evidence in the light most favorable to the trial court's ruling. *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). When the trial court makes explicit fact findings, as it did here, we determine whether the evidence, when viewed in the light most favorable

---

[12] At the hearing on the motion to suppress, appellant also argued that the evidence should be suppressed because the officers trespassed on his property. Appellant does not raise this argument on appeal.

to the trial court's ruling, supports those fact findings. *See id*. at 818-19. We then review the trial court's legal ruling de novo unless its explicit fact findings that are supported by the record are also dispositive of the legal ruling. *Id*. at 819.

The Fourth Amendment protects individuals "against unreasonable searches and seizures." U.S. Const. amend. IV. "A warrantless police entry into a person's home is presumptively unreasonable unless it falls within the scope of one of a few well-delineated exceptions." *Johnson v. State*, 226 S.W.3d 439, 443 (Tex. Crim. App. 2007) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)). One such exception is consensual entry. *Id*. However, if the voluntariness of the consent is challenged at trial, "the State must prove the voluntariness of a consent to search by clear and convincing evidence." *Harrison v. State*, 205 S.W.3d 549, 552 (Tex. Crim. App. 2006) (quoting *State v. Ibarra*, 953 S.W.2d 242, 243 (Tex. Crim. App. 1997)). "Typically, whether consent is voluntary turns on questions of fact and is determined from the totality of the circumstances." *Johnson*, 226 S.W.3d at 443. "For that reason, a finding of voluntary consent is reviewed only for an abuse of discretion." *Id*. "The operative inquiry is whether the evidence presented at the suppression hearing fairly supports the trial court's finding of voluntary consent by clear and convincing evidence." *Id*.

At the hearing on the motion to suppress, appellant testified briefly to establish that he resided at the apartment and had a privacy interest there. The State then called Detective Moseley. Moseley testified that when he arrived at the apartment, he and Detective Gearhart "went to the door, knocked on the door and contacted the women at the home." Cruz answered the door,

25

and Moseley had a conversation with her. When asked about the details of his conversation with Cruz, Moseley testified:

> When I spoke to her at the door, I advised her that Juan had been stopped a short distance away from the apartment. And that him and I believe it was her sister, Muriel had been arrested. I asked her if we could come in and discuss the arrest. She allowed us into the living room area of the apartment. Discussed with her the situation of the arrest for a short time, and asked permission to search the residence from her.

Moseley testified that Cruz gave him permission to search the residence. However, according to Moseley, he did not begin searching the apartment at that time. Moseley testified that although Cruz was fluent in English, he had observed her speak Spanish to the other female in the apartment. Moseley explained that he "had a concern that—being that she was speaking Spanish with the other lady in the home, I wanted to make sure that she understood what I explained to her. And also that if she had any questions there was somebody there that could speak to her and we asked a Spanish-speaking officer to respond to the scene."

The Spanish-speaking officer called to the scene was Officer Wanda Lovell. Officer Lovell testified that upon her arrival at the residence she spoke with Cruz and discussed with her a "consent to search" card. Lovell testified that Cruz appeared to understand everything that Lovell was talking to her about. When asked if there were "[a]ny communication problems whatsoever," Lovell answered no. According to Lovell, after she went over the card with Cruz, Cruz "said it was all right to search the apartment" and signed her name to the consent card. Lovell testified that she also signed the card. When asked if Cruz ever indicated that she wished to withdraw her consent,

Lovell testified that she did not. Lovell also testified that she did not make Cruz any promises or any threats to get her to sign the card or give her consent to search the home.

On cross-examination, Lovell testified that Cruz "understood both [Spanish and English] so whatever language she chose to speak to me at the time that's the language I used to address her." When asked if there was anything about the way Cruz spoke English that would have made Lovell think that she was more comfortable speaking Spanish than English, Lovell answered that there was not. Lovell also testified that Cruz did not ask her questions about Cruz's potential exposure to criminal charges or whether she was going to be arrested.

Lovell was also asked about the timing of when she arrived at the apartment and when Cruz signed the consent card. Lovell testified that she arrived at the apartment at approximately 11:00 p.m. but could not remember at what time she got the consent card signed. The consent card was admitted into evidence. The card was dated "5-8-04 10:59 p.m." Detective Moseley testified that after he saw Cruz sign the consent card, the detectives began searching the premises. Lovell testified that she did not participate in the search.

Detective Moseley was also asked questions about the timing of the search in relation to the time Cruz gave consent. Specifically, appellant asked Moseley questions about the bag of cocaine found in the front yard and the white residue found on the kitchen counter top. Moseley testified that Detective Wadley was the officer who found the bag of cocaine in the front yard, although Moseley also testified that he observed the bag prior to entering the apartment. Moseley explained that after he had been at the residence for "[a] short time, probably 10, 15 minutes," Detective Wadley arrived at the apartment. Moseley could not recall exactly when Wadley arrived

or when Wadley recovered the bag but testified that it was recovered "[s]ometime after [Wadley] had been on the scene."

Moseley also testified that he and Detective Gearhart observed the white residue prior to obtaining consent but that the evidence was not seized until after Cruz gave consent:

> Q: Okay. And at which—and when you asked for permission to search was that before or after you came in and found [the white residue]?
>
> A: We were already in. We were speaking with her. . . .
>
> Q: So you were in the apartment and you found this before you asked for permission to search?
>
> A: No, sir.
>
> Q: I want to make sure that I understand.
>
> A: All right. We were in the kitchen area, we spoke with her. And I say in the kitchen area. We were between the sofa and we spoke with her. The bar was right there. I noticed there was white powder on the bar. We did not collect it or field test it or anything.
>
> Q: When did you field test it because your report indicates that you field tested it?
>
> A: It was field tested later.
>
> . . . .
>
> Q: . . . were any items taken before that consent was signed?
>
> A: No, sir.
>
> Q: After that consent was signed is that when the search was conducted?
>
> A: Yes, sir.

Q: And that's when you—and then after that consent, that's when you got all the evidence we're talking about, the 90 grams of cocaine, scales, that sort of thing? That was all done after you got—after you got that consent?

A: Yes, sir.

Q: And that was on May 7th, approximately, of '05, correct?

A: Right around 11:00. '04.

On cross-examination, Detective Moseley was asked about the circumstances surrounding appellant's arrest prior to the search of the residence. Moseley testified that appellant was arrested on an outstanding warrant. However, Moseley was not able to provide many details about the warrant or the arrest:

Q: Was that warrant in fact a blue warrant, a parole revocation warrant? Is that ringing a bell?

A: Seems like. I really don't recall. I was present for support only in that situation.

. . . .

Q: Okay. And Mr. Figueroa was not arrested on any offense at that point; is that correct?

A: Correct.

Q: Why was the car stopped?

A: I believe that they had information that he had an outstanding warrant.

Q: Okay. And stopped for that—for the purpose of that warrant only?

A: I believe so. Again I was not case agent on that report.

. . . .

Q: When . . . you all were observing [appellant], had you all checked for warrants prior to—while you all are in the process of observing his residence?

A: I believe so, yes, sir.

Q: Okay. And were there any at that point?

A: Yes, sir. I believe they had located that warrant that afternoon.

Q: And so they located that warrant that afternoon and did they have a copy of that warrant then?

A: I have no idea.

. . . .

Q: When Mr. Figueroa, the warrant that he was arrested on, was he held on that warrant?

A: I have no idea.

Q: Okay. You don't know . . . if he was released shortly afterwards?

A: Yes, he was initially held in Killeen jail. It was my understanding that he was later released. I really wasn't involved in that part of the case.

Q: Were you aware of why he was released?

A: Yes, sir.

Q: Why was he released?

A: I was later told that the warrant was—was for a different individual that had used his identity.

Finally, Detective Gearhart testified. Gearhart testified that Cruz "didn't speak English really well." However, he added that "[w]e were able to communicate with her. She spoke English to a point where we were able to tell her we were the police but I didn't directly talk to her

30

myself. Detective Moseley was talking to her." When asked what Moseley told Cruz, Gearhart testified, "[He] said we were police and that we were—I don't remember the specific details of the conversation but generally we were the police. We were conducting an investigation involving Mr. Figueroa." When asked if Moseley informed Cruz that they were looking for contraband inside the house, Gearhart answered, "I don't recall exactly what he said we were looking for. I believe he told her that we were narcotics investigators." Gearhart also testified, in agreement with Moseley's testimony, that no part of the search was conducted prior to Officer Lovell obtaining Cruz's signature on the consent card.

At the conclusion of the hearing, the district court denied the motion to suppress. Subsequently, the district court filed findings of fact and conclusions of law. Among its findings, the district court found that Cruz "knowingly and voluntarily gave consent to search the residence"; that "[t]he consent to search . . . was not induced or caused by any threats, persuasion, compulsion, intimidation, violence, promises, unlawful detention, or anything else other than the free and voluntary act of Luz Cruz"; that "[t]he residence located at 2807 Cantabrian was not searched by law enforcement officers prior to obtaining the consent to search"; and that "the cocaine and digital gram scale seized in this case was done so pursuant to a valid consent to search that was provided by Luz Cruz, and is therefore admissible as evidence in the trial of this matter."

We conclude that the evidence presented at the suppression hearing "fairly supports the trial court's finding of voluntary consent by clear and convincing evidence." *Johnson*, 226 S.W.3d at 443. Detective Moseley testified that after he advised Cruz of the situation involving appellant, she gave Moseley permission to search the premises. However, because Cruz spoke both

31

English and Spanish, Moseley decided to wait to search the apartment until after a Spanish-speaking officer arrived at the scene. Officer Lovell, the Spanish-speaking officer, testified that Cruz appeared to understand everything that Lovell was talking to her about and that there were no communication problems. Lovell also testified that Cruz "said it was all right to search the apartment" and that she signed her name to the consent card. Lovell further testified that she did not make Cruz any promises or any threats to get her to sign the card or give her consent to search the home. Additionally, according to Lovell, Cruz did not at any point indicate that she wished to withdraw her consent.

We disagree with appellant's contention that Cruz's consent was somehow "tainted" by appellant's arrest. Even were we to assume that appellant's arrest was "illegal," as he asserts it was, it was not appellant who gave consent to search the apartment. In his brief, appellant refers to several factors used in determining whether evidence derived from a warrantless but consensual search following an illegal arrest is admissible. *See Brick v. State*, 738 S.W.2d 676, 681 (Tex. Crim. App. 1987). However, the *Brick* factors are used in cases in which "the legality of the search is dependent upon the consent of the *detainee*." *Grimaldo v. State*, 223 S.W.3d 429, 432 (Tex. App.—Amarillo 2006, no pet.) (emphasis added). In this case, the legality of the search was dependent upon Cruz's consent, not appellant's. *See Randolph*, 547 U.S. at 106.

We also reject appellant's assertion that had he been at the residence and not under arrest at the time of the search, he would not have consented to the search. Appellant did not provide any testimony at the suppression hearing to that effect. Furthermore, there is nothing in the record to suggest that appellant was on his way home at the time of his arrest, and that, had appellant not

32

been arrested, he would have been at his home available to refuse consent at the time the officers conducted the search.

Finally, appellant's complaint about the search taking place prior to Cruz giving her consent finds no support in the record. The "consent to search" card indicates that Officer Lovell obtained Cruz's consent at 10:59 p.m.[13] Detectives Moseley and Gearhart both testified that they did not search the apartment until after Officer Lovell obtained Cruz's signature on the card. This testimony is undisputed. Although there is evidence in the record that the detectives observed both a bag of cocaine in the front yard and white powder on the kitchen counter prior to obtaining consent, Detective Moseley testified that neither of these items were seized until after Cruz signed the consent card. However, even if these particular items had been seized prior to Cruz signing the consent card, it appears from the record that both of these items were found in plain view. *See Horton v. California*, 496 U.S. 128, 133 (1990) (stating that if item is already in plain view, neither its observation nor its seizure involves any invasion of privacy under Fourth Amendment).

We overrule appellant's fifth, sixth, and seventh issues.

**Ineffective assistance of counsel**

In his eighth issue, appellant claims that counsel rendered ineffective assistance during the guilt-innocence phase of the trial. Specifically, appellant contends that trial counsel was ineffective in not calling Officer Lovell to testify during trial, and in not objecting during

---

[13] Although the card was dated "5-8-04," the district court found that this was a "clerical mistake." The record supports this finding. All of the officers testified that the search was conducted on May 7, 2004.

trial to the admission of State's Exhibits 1 through 25, the evidence related to the search of appellant's apartment.

To demonstrate ineffective assistance of counsel, a defendant must satisfy the two-pronged inquiry articulated by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). First, the defendant must show that counsel's performance was "deficient." In other words, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687-88; *Mata v. State*, 226 S.W.3d 425, 428 (Tex. Crim. App. 2007). Second, "the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Mata*, 226 S.W.3d at 429. "A *Strickland* claim must be 'firmly founded in the record' and 'the record must affirmatively demonstrate' the meritorious nature of the claim." *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005) (quoting *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999)). Additionally,

> Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Robertson v. State*, 187 S.W.3d 475, 482 (Tex. Crim. App. 2006) (quoting *Strickland*, 466 U.S. at 689).

34

*Decision not to call Officer Lovell to testify during trial*

As discussed above, during the suppression hearing, Officer Lovell testified about the circumstances surrounding Cruz's consent to search the apartment. However, because the issue of Cruz's consent was also submitted for the jury's consideration per an article 38.23 instruction,[14] appellant contends that trial counsel should have called Lovell to testify during trial.

During the evidentiary hearing on the motion for new trial, counsel was asked why he did not call Officer Lovell to testify. Counsel explained that he anticipated that the State would call Lovell to testify, and that when the State decided not to call her, counsel chose not to subpoena her because it was not his practice to subpoena the State's witnesses. Appellant then asked counsel if counsel thought it would have been important for the jury to know about the timing of the search in relation to Cruz's consent. Counsel testified, "I think . . . the time line had been established through the other officers, and I believe the issue regarding the time on the card . . . was already

---

[14] Article 38.23 of the code of criminal procedure provides:

(a) No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.

In any case where the legal evidence raises an issue hereunder, the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence was obtained in violation of the provisions of this Article, then and in such event, the jury shall disregard any such evidence so obtained.

Tex. Code Crim. Proc. Ann. art. 38.23(a) (West 2003).

before the jury." Counsel recalled that "the time line had been discussed thoroughly and the card itself was in evidence at that point."

The record reflects, consistent with counsel's testimony, that the timing of the search in relation to Cruz's consent was before the jury, even without Officer Lovell's testimony. The consent card was in evidence, and both Detective Moseley and Detective Gearhart testified to the time line of events at the apartment. Counsel subjected the detectives to extensive and thorough cross-examination in an effort to prove that the search occurred prior to Cruz's consent and that the consent was not voluntary. Counsel also addressed the issue of Cruz's consent in his closing argument.

Furthermore, Officer Lovell had already testified at the suppression hearing. Counsel could have anticipated that her testimony at trial would be consistent with her earlier testimony. Therefore, counsel could have concluded that Lovell's testimony would support the State's theory of the case and undermine appellant's argument that Cruz's consent was not voluntary. On this record, we conclude that appellant has failed to overcome the presumption that counsel's decision not to call Lovell to testify was part of a sound trial strategy.

### *Failure to object*

Appellant also complains about counsel's failure to object during trial to the admission of State's Exhibits 1 through 25, the evidence related to the search of the apartment. During the evidentiary hearing on the motion for new trial, counsel testified that he did not remember whether he objected to this evidence during trial, and he admitted that "[i]f the issue of suppression was not properly preserved, then of course" appellant would have been prejudiced.

36

When a pretrial motion to suppress evidence is overruled, the defendant need not subsequently object at trial to the same evidence in order to preserve error on appeal. *Lemons v. State*, 135 S.W.3d 878, 882 (Tex. App.—Houston [1st Dist.] 2004, no pet.) (citing *Moraguez v. State*, 701 S.W.2d 902, 904 (Tex. Crim. App. 1986)). However, when the defendant affirmatively asserts during trial that he has "no objection" to the admission of the complained of evidence, he waives any error in the admission of the evidence, despite the pretrial ruling. *Id.*; *see also Moody v. State*, 827 S.W.2d 875, 889 (Tex. Crim. App. 1992) (holding that "[a]ppellant's response of 'no objection' waived his claim to inadmissibility of the challenged evidence.").

The record reflects that counsel objected to some of the State's exhibits but not to all of them. Most of the time, counsel simply did not comment. However, prior to the admission of the digital scales seized at the apartment, counsel affirmatively indicated that he had "no objection" to their admission.

Even assuming a mistake on the part of trial counsel, it does not satisfy the two-pronged *Strickland* analysis. Appellant has failed to prove that there is a reasonable probability that, but for this error, the result of the proceeding would have been different. Because counsel preserved error for most of the evidence seized at the apartment, we have considered the merits of appellant's motion to suppress. Because we have determined that the district court did not abuse its discretion in overruling the motion to suppress, appellant has not demonstrated prejudice. *See id.* at 884.

We overrule appellant's eighth issue.

37

**Pro se motion to quash the indictment**

In his ninth issue, appellant contends that the district court abused its discretion in refusing to allow him to present a pro se motion to quash the indictment. Appellant asserts that the district court's refusal amounted to a violation of his right to self-representation. *See Faretta v. California*, 422 U.S. 806, 814-17 (1975). However, because appellant was already represented by counsel at the time he attempted to present the motion, the actual issue is whether appellant had a right to hybrid representation, which is representation "partially pro se and partially by counsel." *Landers v. State*, 550 S.W.2d 272, 279-80 (Tex. Crim. App. 1977); *Ganther v. State*, 187 S.W.3d 641, 648 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd).

Defendants have no absolute right to hybrid representation.[15] *Hathorn v. State*, 848 S.W.2d 101, 123 n.12 (Tex. Crim. App. 1992). "Once an accused is represented by counsel, the trial court is entitled to look solely to the accused's counsel and is not required to consider pro se pre-trial motions which were filed when the accused was represented by counsel." *Meyer v. State*, 27 S.W.3d 644, 648 (Tex. App.—Waco 2000, pet. ref'd). However, the trial court may, in its

---

[15] This rule was first announced by the court of criminal appeals in *Landers v. State*, 550 S.W.2d 272 (Tex. Crim. App. 1977). Appellant suggests that *Landers* should no longer be followed after the Supreme Court's decision in *McKaskle v. Wiggins*, 465 U.S. 168 (1984). In *McKaskle*, the Supreme Court held that a "defendant's right to self-representation plainly encompasses certain specific rights to have his voice heard. The *pro se defendant* must be allowed to control the organization and content of his own defense, to make motions, to argue points of law, to participate in voir dire, to question witnesses, and to address the court and the jury at appropriate points in the trial." 465 U.S. at 174 (emphasis added). We find nothing in *McKaskle* that casts doubt on the rule announced in *Landers*. *McKaskle* addressed the role of "standby counsel" in assisting a pro se defendant's defense. *Id*. at 170. In this case, appellant was not a "pro se defendant," nor was he ever assisted by "standby counsel." Appellant was represented by counsel throughout the trial. Therefore, *McKaskle* is inapplicable here.

discretion, permit hybrid representation. *Scarbrough v. State*, 777 S.W.2d 83, 92 (Tex. Crim. App. 1989). We review a trial court's ruling on hybrid representation for abuse of discretion, and a trial court does not abuse its discretion unless its decision lies outside the zone of reasonable disagreement. *Ganther*, 187 S.W.3d at 648 (citing *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990)). When reviewing a trial court's decision, we must be mindful that hybrid representation "has great potential for chaos." *Id*. (citing *Landers*, 550 S.W.2d at 280).

In his pro se motion to quash the indictment, appellant asserted that "[t]he grand jury that indicted the defendant was underrepresentative [sic] of either African-Americans or Hispanics or both[16] in violation of defendant's equal protection rights under the Fourteenth Amendment of the United States Constitution." Prior to trial, the district court asked appellant's counsel if he was adopting this motion. Counsel responded that he was not. The district court then addressed appellant:

> Mr. Figueroa, I can't have both of you being the lawyer. I've either got to have you be the lawyer or have him be the lawyer, and I can't have both of you. If there is a motion filed and it has merit, [counsel] will adopt it. If there is a motion filed and doesn't have merit, I'm not going to hear it. I don't have time to hear it.
>
> But I will—I will say this to you. Last Friday this file was handed to me, and I read the file and I read your motion. And I can tell you that we have had other lawyers that have filed the same motion. It has been heard in Bell County at other times when we didn't have a jury waiting in the hall. And our panels of grand jury commissioners and our panels of grand jurors have withstood scrutiny in terms of the minority composition of them . . . .
>
> And, I mean, the motion has been tried. It's been heard. It's withstood scrutiny in this county. And if [it had been] adopted by an attorney and we had more time, I

---

[16] Appellant claimed that he was "Afro-American by race" and "Hispanic by heritage."

would certainly hear it for you; but it's not adopted by an attorney and we don't have time.

We conclude that the district court did not act outside the zone of reasonable disagreement in refusing to consider appellant's pro se motion. The record indicates that the district court, after reading the motion, reasoned that counsel had chosen not to adopt the motion, that similar motions had been "tried" and "heard," and that there was no time to consider the motion because the jury was "waiting in the hall." On this record, we find no abuse of discretion in the district court's decision to not consider appellant's pro se motion to quash the indictment.

We overrule appellant's ninth issue.

**Court costs, attorney's fees, fines, and restitution**

Appellant's remaining issues address alleged defects in the district court's judgment. In appellant's tenth and eleventh issues, appellant asserts that the district court erred in ordering him to pay attorney's fees as a cost of court without providing him with a written bill of costs and without first determining whether appellant had or would have the financial resources to enable him to pay those costs. In appellant's twelfth issue, appellant contends that the district court erred in "ordering" him to pay court costs, attorney's fees, fines, and restitution as a condition of his parole. Finally, in appellant's thirteenth issue, appellant contends that it was error for the district court to include restitution as a condition of parole.

*"Ordering" conditions of parole*

Because appellant's twelfth issue provides the framework for appellant's remaining issues, we shall address it first. With the exception of restitution, which we deal with separately below, the authority to place conditions on a defendant's parole is solely within the purview of the executive branch of the State government, here, the Board of Pardons and Parole. *See* Tex. Gov't Code Ann. § 508.221 (West 2004); *McNeill v. State*, 991 S.W.2d 300, 302 (Tex. App.—Houston [1st Dist.] 1999, pet. ref'd, untimely filed); *see also Rushin v. State*, No. 03-06-0068-CR, 2006 Tex. App. LEXIS 6693, at *9 (Tex. App.—Austin July 28, 2006, pet. ref'd) (mem. op., not designated for publication). As a general rule, a trial court has no authority to order a condition of parole. *Bray v. State*, 179 S.W.3d 725, 728 (Tex. App.—Fort Worth 2005, no pet.). The State acknowledges this rule and concedes that it was error for the district court to impose conditions of parole in the court's written judgment. Accordingly, we will modify the judgment to reflect that the district court "recommends" to the Board of Pardons and Parole that appellant pay court costs, attorney's fees, and fines as a condition of parole.[17]

---

[17] Appellant contends that the proper remedy is to eliminate in its entirety the last paragraph of the judgment relating to parole conditions. However, because trial courts have the authority to "recommend" conditions of parole, it has been the consistent practice of this Court to retain the paragraph relating to parole conditions but modify the paragraph to read as a recommendation. *See, e.g., Rendon v. State*, No. 03-06-00671-CR, 2007 Tex. App. LEXIS 7234, at *10-11 (Tex. App.—Austin Aug. 31, 2007, no pet.) (mem. op., not designated for publication); *Bitterman v. State*, No. 03-06-00386-CR, 2007 Tex. App. LEXIS 7235 (Tex. App.—Austin Aug. 28, 2007, pet. dism'd) (mem. op., not designated for publication); *Davis v. State*, No. 03-06-00370-CR, 2006 Tex. App. LEXIS 10328, at *2 (Tex. App.—Austin Dec. 1, 2006, no pet.) (mem. op., not designated for publication); *Terrell v. State*, No. 03-06-00250-CR, 2006 Tex. App. LEXIS 9780, at *13-14 (Tex. App.—Austin Nov. 10, 2006, no pet.) (mem. op., not designated for publication); *Rushin v. State*, No. 03-06-00068-CR, 2006 Tex. App. LEXIS 6693, at *10 (Tex. App.—Austin July 28, 2006, pet. ref'd) (mem. op., not designated for publication). We shall continue that practice in this case.

We sustain appellant's twelfth issue.

### *Attorney's fees*

Article 26.05(g) of the code of criminal procedure provides, "If the court determines that a defendant has financial resources that enable him to offset in part or in whole the costs of the legal services provided, including any expenses and costs, the court shall order the defendant to pay during the pendency of the charges or, if convicted, as court costs the amount that it finds the defendant is able to pay." Tex. Code Crim. Proc. Ann. art. 26.05(g) (West Supp. 2007). The code of criminal procedure provides further that "[a] cost is not payable by the person charged with the cost until a written bill is produced or is ready to be produced, containing the items of cost, signed by the officer who charged the cost or the officer who is entitled to receive payment for the cost." *Id*. art. 103.001 (West 2006). The record does not reflect that the district court made a determination as to whether appellant had the financial resources that would enable him to pay the costs of the legal services provided to him. The record also does not reflect that the district court provided appellant with a "written bill of costs" relating to attorney's fees. Instead, the district court's judgment provided that attorney's fees were "to be determined" at some later date.

However, the above provisions would only become effective at the time when appellant is actually ordered to pay attorney's fees. That time is not now, as the judgment provides that the district court is ordering appellant to pay court costs and attorney's fees as a *condition of parole*. As we explained above, we are modifying the district court's judgment to reflect that the district court "recommends" that appellant pay attorney's fees as a condition of parole. The provisions to which appellant cites do not impose conditions on the district

42

court's recommendation that appellant pay attorney's fees. "A trial court's recommendation is not an order; such a recommendation imposes no obligation on anyone to observe it." *Bitterman v. State*, No. 03-06-00386-CR, 2007 Tex. App. LEXIS 7235, at *17 (Tex. App.—Austin Aug. 28, 2007, pet. dism'd) (mem. op., not designated for publication); *see also Rendon v. State*, No. 03-06-00671-CR, 2007 Tex. App. LEXIS 7234, at *9 (Tex. App.—Austin Aug. 31, 2007, no pet.) (mem. op., not designated for publication) ("[W]hile it would be better practice for the trial court to make a determination of attorney's fees and have the amount reflected in the judgment, it is not a condition precedent to a recommendation for a parole condition.").

The Board of Pardons and Parole has the power to impose, as a condition of parole, any condition that a court could impose on a defendant placed on community supervision. Tex. Gov't Code Ann. § 508.221 (West 2004). The conditions that a court can impose on a defendant under community supervision are quite broad; the court can impose "any reasonable condition that is designed to protect or restore the community, protect or restore the victim, or punish, rehabilitate, or reform the defendant." Tex. Code Crim. Proc. Ann. art. 42.12, § 11(a) (West 2006). Ordering the payment of court-appointed attorney fees, court costs, and the assessed fine is included. *Id.* § 11(a)(8), (11). When (and if) the Board accepts the district court's recommendation, only then will the amount of attorney's fees, and appellant's ability to pay them, become an issue.

We overrule appellant's tenth and eleventh issues.

43

*Restitution*

There is no prohibition against a trial court making a recommendation for restitution in its judgment. *McNeil*, 991 S.W.2d at 302. In fact, in some cases a trial court may *order* restitution as a condition of parole. *See* Tex. Code Crim. Proc. Ann. art. 42.037 (West 2006); *Campbell v. State*, 5 S.W.3d 693, 696 & n.6 (Tex. Crim. App. 1999). In this particular case, however, the judgment reflects a determination by the district court that there was no restitution. Therefore, the district court incorrectly included restitution as a condition of parole. This Court has the authority to modify an incorrect judgment when the necessary information is available to do so. *See Mullins v. Mullins*, 202 S.W.3d 869, 878 (Tex. App.—Dallas 2006, pet. denied) (citing Tex. R. App. P. 43.2(b)); *see also Bitterman*, 2007 Tex. App. LEXIS 7235, at *18 (modifying judgment to delete restitution as recommended condition of parole when trial court determined that no restitution was owed). In light of the district court's determination that there was no restitution, we will modify the judgment to delete restitution as a condition of parole.

We sustain appellant's thirteenth issue.

**Incorrect statute referenced in judgment**

Finally, in an unassigned point of error in counsel's brief, appellant observes that the statute referenced in the district court's judgment, section 481.113 of the health and safety code, is incorrect. We agree. Section 481.113 involves the offense of manufacturing, delivering, or possessing with intent to deliver a controlled substance listed in Penalty Group 2. Tex. Health & Safety Code Ann. § 481.113(a) (West 2003). Cocaine, however, is a controlled substance listed in Penalty Group 1. *Id*. § 481.102(3)(D) (West Supp. 2007). The statute that applies to the offense of

manufacturing, delivering, or possessing with intent to deliver a controlled substance listed in Penalty Group 1 is section 481.112, health and safety code. The appropriate remedy is to modify the district court's judgment to reflect the correct statute. *See* Tex. R. App. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27-28 (Tex. Crim. App. 1993).

## CONCLUSION

We have overruled all of appellant's issues except for his twelfth and thirteenth issues, which we have sustained. Accordingly, we modify the portion of the district court's judgment that currently states:

Furthermore, the following special findings or orders apply:

PAROLE CONDITION: DEFENDANT ORDERED BY COURT TO PAY COURT COSTS, ATTORNEY FEES, FINES, AND RESTITUTION AS A CONDITION OF PAROLE.

The judgment will now state as follows:

Furthermore, the following provision applies:

PAROLE CONDITION: THE COURT RECOMMENDS THAT THE DEFENDANT PAY COURT COSTS, ATTORNEY FEES, AND FINES AS A CONDITION OF PAROLE.

We also modify the judgment to reflect that the "Statute for Offense" was "Section 481.112, Health and Safety Code." As modified, we affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Justices Patterson, Pemberton and Waldrop

Modified and, as Modified, Affirmed

Filed:   March 21, 2008

Publish