# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-09-00169-CR

**John Tomack Williams, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE DISTRICT COURT OF CALDWELL COUNTY, 421ST JUDICIAL DISTRICT
### NO. 2009-036, HONORABLE JACK H. ROBISON, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

A jury convicted John Tomack Williams of four counts of possession of a controlled substance with intent to deliver. *See* Tex. Health & Safety Code Ann. §§ 481.112, .114, .121 (West 2010). The jury assessed punishment at eighty years' imprisonment and a $10,000 fine for the first count, ten years' imprisonment and a $10,000 fine for the second count, 730 days' imprisonment and a $10,000 fine for the third count, and eighty years' imprisonment and a $10,000 fine for the fourth count. On appeal, Williams challenges the factually sufficiency of the evidence to support his convictions. Because we conclude that the evidence is factually sufficient to support three of Williams's convictions, we affirm the trial court's judgments as to those convictions. Because we conclude that the trial court misidentified and mischaracterized Williams's conviction for possession of marijuana with intent to deliver (count two) but that the evidence is factually sufficient to support the correct offense, possession of marijuana, we modify the judgment

and affirm, as modified, the portion of the judgment finding guilt. Because we conclude that the trial court erred in its imposition of punishment regarding Williams's conviction for possession of marijuana, we reverse the portion of the judgment imposing the sentence, and we remand this cause to the trial court for a new punishment hearing as to that conviction only.

## BACKGROUND

The record shows that in February 2004, officers from the Luling Police Department and the Caldwell County Sheriff's Office responded to a call reporting an assault or fight in progress at a house located just outside the Luling city limits on FM 2984 ("the house"). Two Luling police officers arrived outside the house. Sergeant Larry Stanley arrived shortly after the Luling officers, and he observed between twenty and thirty people in the street and in the area around the house. Stanley testified that he and Officer James Davenport arrived at the same time and that they spoke with the alleged victim of the assault, Thomas Rodriguez, who was Williams's cousin. Rodriguez claimed that Williams had assaulted him. Davenport observed large, swollen, knotted areas around Rodriguez's eyes, face, and neck and elongated red marks on his stomach that appeared to have been made by a long, thin weapon, such as a pipe. Davenport did not observe any injuries on Williams. After determining that Rodriguez's injuries were consistent with Rodriguez's description of the assault, Davenport arrested Williams for assault. At trial, Rodriguez testified that the fight had occurred in the living room of the house.

At some point after Davenport and Stanley arrived at the house, Rodriguez informed Stanley that he thought someone had stolen his assault rifle. Stanley was aware of numerous phone calls to the police in the past regarding sounds of automatic gunfire coming from the house, and he

was concerned about the possibility that Rodriguez's rifle was in the house. Stanley testified that he asked Rodriguez if he could check inside the house to determine whether the rifle was inside, and Rodriguez gave him permission.[1] Stanley testified that he was escorted throughout the house by Rodriguez's girlfriend.

Rodriguez's account of the situation differed. Rodriguez testified that he told Stanley that his rifle was missing but that he did not give Stanley permission to search the house for the rifle. He testified that Stanley asked for permission but that he told Stanley that he could not give him permission because the house did not belong to him. He also testified that his girlfriend never went into the house with Stanley.

According to Stanley's account, however, Rodriguez's girlfriend escorted him to the house and then led him throughout the house. Stanley testified that the house contained three bedrooms, a living room, and a bathroom. The house did not contain a kitchen. Stanley testified that Rodriguez's girlfriend identified each of the bedrooms, stating that one of the bedrooms belonged to Williams, another belonged to Rodriguez, and the third belonged to George Williams ("George"), who is Williams's brother. As Stanley walked through the house, he observed narcotics and narcotics paraphernalia in plain view.[2] In the living room, he observed a bottle with no prescription label containing cough syrup with codeine. In the bedroom identified as George's room, Stanley observed a razor blade with white-powder residue, a prescription bottle with no label containing unknown white pills, and multiple bottles without prescription labels containing cough

---

[1] Williams does not challenge the legality of the search.

[2] Stanley did not find the assault rifle in the house.

3

syrup with codeine. Based on his observations, Stanley secured the house and contacted Officer Kenneth Schmidt, who worked in a narcotics task force, to inform him of the illegal substances found in the house.

Schmidt testified that he was already familiar with the house at that time and that he knew that Williams, Rodriguez, and George lived there. When he arrived at the scene after receiving Stanley's call, he walked through the house to confirm Stanley's observations of the illegal substances in the home. He then obtained a search warrant, and he and other officers executed the warrant.

In the bedroom identified as Williams's room, officers found the following items: $87 in a shoe; $252 in another shoe; a wristband wrapped around a plastic baggie containing a white, powdery substance believed to be cocaine; a student-identification card identifying Williams; a pair of pants with cash in the pocket; a ziploc bag containing cash; a cup filled with change; a jacket with cash in the pocket; a shoe box holding a ziploc bag that contained a white, powdery substance believed to be cocaine; a black gym bag containing $64 in cash; $694 in cash inside another shoe box; $30 inside a compact-disc case; a letter written to Williams; several photos showing Williams alone and with other people; a driver's license identifying Williams but listing a different address; a compact-disc case containing razor blades and small bags; a shoe box containing a coin purse, razor blades, a man's wedding band, several rubber bands, sandwich bags, a ziploc bag containing smaller ziploc bags, and rolling papers; and strawberry-flavored cigars. All of the coins in the room added up to $353.

In the bedroom identified as George's room, officers found a black bag containing a white, powdery substance believed to be cocaine; small plastic bags containing a green, leafy

4

substance believed to be marijuana; bottles containing pills that were believed to be Xanax; a pill bottle containing carisoprodol; several bottles of cough syrup with codeine; a book titled "The Pill Book"; a diamond concealed in clothing; a razor blade with a white powdery substance on it; a hat holding a plastic bag that contained a white, powdery substance believed to be cocaine; a letter addressed to George; a receipt for a 1990 Lexus; and a total of $814 in cash in different places in the room.

In the bedroom identified as belonging to Rodriguez, officers found cash in a drawer; a bank-deposit slip containing Rodriguez's name; a bill from Sears; and a utility bill and phone bill addressed to a woman named Kamren Kizer. At trial, Rodriguez testified that he had dated Kizer, that she rented the house, and that she let him and many other people use the house as a place to "party and chill."

In the remaining areas of the house, the officers found several more items. In the bathroom toilet, officers found seven rock-like substances believed to be crack cocaine. On the porch, officers found sweatpants with cash in the pocket. In the living room, officers found two jackets, each containing a large amount of cash in the pocket; a bottle of cough syrup containing codeine; a digital scale; two sales ledgers; two wallets, one containing a copy of a car title identifying a person named John Alvarez; a driver's license identifying a person named Antonio Acosta; another driver's license identifying a person named John Alvarez; and a social-security card and credit card identifying a person named William Fennell. The total amount of cash found in the living room was $725. The total amount of cash and coins found in the entire house was $3,019.64.

A chemist for the department of public safety, Henry Amen, testified regarding his analysis of the various substances found by the officers in the house. Amen testified that he analyzed

substances that were stored in several bags and that his analysis revealed 15.34 grams of cocaine in one bag; 0.17 grams of cocaine in a second bag; 0.04 grams of cocaine in a third bag; 5.02 ounces of marijuana in a fourth bag; and an undetermined quantity of pills containing alprazolam in a fifth bag. His analysis also revealed a bottle holding pills that contained alprazolam; a bottle containing 360.54 grams of codeine; and a bottle holding pills that contained carisoprodol.

At trial, the State offered evidence showing that Williams lived at the house. The officer who arrested Williams, Officer James Davenport, testified that he knew that Williams lived in the house because he had observed Williams there between twenty and thirty times prior to the date of the arrest. Sergeant Stanley testified that he knew Williams lived at the house because he had observed Williams there "on a regular basis" and at least a dozen times before the date of the arrest. Officer Schmidt testified that Williams lived in the house and that Schmidt had personally observed Williams at the house on "many occasions" prior to the date of the arrest. Officer Stuart testified that he had conducted surveillance on the house prior to the date of the arrest and that he observed Williams to be living in the house. Stuart testified that on the night of the arrest, he observed Rodriguez telling Officer Schmidt the names of the people who resided in each of the bedrooms in the house and identifying Williams as the occupant of one of the bedrooms. Stanley also testified that on the night of the arrest, Rodriguez's girlfriend led him through the house and gave him the names of the people residing in each of the three bedrooms, including identifying one of the bedrooms as belonging to Williams.

Williams offered evidence showing that he did not live at the house. Specifically, Williams's cousin, Rodriguez, testified that the house belonged to Kamren Kizer. Rodriguez testified that Williams was not living at the house in February 2004 but was instead living with his

girlfriend down the street at another residence. Rodriguez also testified that the bedroom that the police had identified as Rodriguez's bedroom was Kizer's room and that the other two bedrooms did not belong to anyone and were open for anyone to use.

Williams's former girlfriend testified that Williams was living with her in February 2004, having moved in with her at the beginning of that month. A friend of Williams also testified that Williams was living with his girlfriend in 2004. When asked who lived in the house where the controlled substances were found, Williams's friend answered, "hopefully no one" because the house did not have a kitchen or working restroom.

After hearing all the evidence, the jury found Williams guilty of all four counts alleged in the indictment: possession of cocaine with intent to deliver, possession of marijuana with intent to deliver, possession of alprazolam with intent to deliver, and possession of codeine with intent to deliver. After a punishment hearing, the jury assessed punishment at eighty years' imprisonment and a $10,000 fine for the first count, ten years' imprisonment and a $10,000 fine for the second count, 730 days' imprisonment and a $10,000 fine for the third count, and eighty years' imprisonment and a $10,000 fine for the fourth count. This appeal followed.

**DISCUSSION**

Williams raises one issue, challenging the factual sufficiency of the evidence to support all four of his convictions. We raise a second issue on our own motion to address errors that we discovered in one of the four judgments in this case. We will discuss each of the two issues separately below.

*Factual Sufficiency*

In his sole issue, Williams challenges the factual sufficiency of the evidence to support his convictions. To prove possession of a controlled substance with intent to deliver, the State must establish that the defendant: (1) exercised care, custody, control, or management over the substance; (2) intended to deliver the substance to another; and (3) knew the substance was a controlled substance. *See* Tex. Health & Safety Code Ann. §§ 481.002(38), .112(a), .114, .121 (West 2010); *Figueroa v. State*, 250 S.W.3d 490, 500 (Tex. App.—Austin 2008, pet. ref'd). Here, Williams challenges only the first and third elements—the elements of possession, *see Poindexter v. State*, 153 S.W.3d 402, 405 (Tex. Crim. App. 2005)— alleging that the State failed to prove that Williams knew of the controlled substances and exercised control over them.

### A. Standard of Review

In reviewing the factual sufficiency of the evidence, we consider all the evidence in a neutral light, while giving due deference to the fact-finder's determinations. *See Vasquez v. State*, 67 S.W.3d 229, 236 (Tex. Crim. App. 2002). We must then determine whether the evidence supporting the verdict is so weak or so against the great weight and preponderance of the evidence as to render the verdict manifestly unjust. *See Steadman v. State*, 280 S.W.3d 242, 246 (Tex. Crim. App. 2009).

In a jury trial, the jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *See Lancon v. State*, 253 S.W.3d 699, 707 (Tex. Crim. App. 2008). We may not reweigh the evidence and substitute our judgment for that of the fact-

finder. *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006); *King v. State*, 29 S.W.3d 556, 563 (Tex. Crim. App. 2000).

### B. Law of Parties

In this case, the trial court instructed the jury on the law of parties, authorizing the jury to find Williams guilty if he acted with the intent to promote or assist the commission of the offense and solicited, encouraged, directed, aided, or attempted to aid another person in committing the offense. *See* Tex. Penal Code Ann. § 7.02(a)(2) (West 2003). The mere presence of the defendant at the scene of the offense will not support a conviction; however, when combined with other facts, the defendant's presence may show that the defendant was a participant. *See Beardsley v. State*, 738 S.W.2d 681, 685 (Tex. Crim. App. 1987); *Edwards v. State*, 106 S.W.3d 833, 842 (Tex. App.—Dallas 2003, pet. ref'd). Participation as a party may be shown by events occurring before, during, and after the commission of the offense, and may be demonstrated by actions showing an understanding and common design to do the prohibited act. *Salinas v. State*, 163 S.W.3d 734, 739-40 (Tex. Crim. App. 2005).

### C. Links to Controlled Substances

Where, as here, the accused is not in exclusive possession of the place where the substance is found, his control over and knowledge of the controlled substance cannot be established unless there are additional independent facts and circumstances that link him to the controlled substance. *See Poindexter*, 153 S.W.3d at 406. The purpose of linking the accused to the controlled substance is to protect innocent bystanders from conviction based solely on their proximity to the controlled substance. *See id*. There are several factors by which a defendant may, under the unique

9

circumstances of each case, be sufficiently linked to the controlled substance, including: (1) the defendant's presence when a search is conducted; (2) whether the controlled substance was in plain view; (3) the defendant's proximity to and the accessibility of the controlled substance; (4) whether the defendant was under the influence of a controlled substance when arrested; (5) whether the defendant possessed other contraband or narcotics when arrested; (6) whether the defendant made incriminating statements when arrested; (7) whether the defendant attempted to flee; (8) whether the defendant made furtive gestures; (9) whether there was an odor of contraband; (10) whether other contraband or drug paraphernalia were present; (11) whether the defendant owned or had the right to possess the place where the drugs were found; (12) whether the place where the drugs were found was enclosed; (13) whether the defendant was found with a large amount of cash; and (14) whether the conduct of the defendant indicated a consciousness of guilt. *See Figueroa*, 250 S.W.3d at 500. It is not the number of links that is dispositive, but rather the logical force of all the evidence, direct and circumstantial. *Id*. at 501. The force of the links need not be such as to exclude every other alternative hypothesis except the defendant's guilt. *Id*.

### D. Analysis

Williams contends that the evidence is factually insufficient to establish that he had knowledge of or exercised control over the controlled substances found in the house because the State did not establish sufficient links between Williams and the controlled substances. We will consider each link separately, viewing all the evidence in a neutral light. Regarding the first link—Williams's presence when the search was conducted—the evidence shows that Williams was not inside the house when officers arrived but that he was in the area around the house and had just

10

been involved in a fight with his cousin in the living room of the house. Evidence regarding the second link—whether controlled substances were in plain view—shows that some of the substances were in plain view. While walking throughout the house, Sergeant Larry Stanley observed narcotics and narcotics paraphernalia in plain view, including a razor blade with white-powder residue, a prescription bottle with no label containing unknown white pills, and multiple bottles with no prescription labels containing cough syrup with codeine. When Officer Kenneth Schmidt walked through the house to confirm Stanley's findings, Schmidt also noticed in plain view a green, leafy substance that he believed to be marijuana. Regarding the third link—Williams's proximity to and the accessibility of the controlled substances—the evidence shows that Williams was outside the house when officers arrived and was therefore not in close proximity to the controlled substances inside the house. However, Rodriguez testified that he and Williams had gotten into a fight inside the house that night, prompting the call to police. Thus, the evidence shows that Williams had been in proximity to the controlled substances shortly before officers arrived. Regarding links four through nine—whether Williams was under the influence of a controlled substance when arrested, whether he possessed other contraband, whether he made incriminating statements, whether he attempted to flee, whether he made furtive gestures, and whether there was an odor of contraband—there is no evidence establishing any of those links.

Evidence pertaining to the tenth link—whether other contraband or drug paraphernalia were present—shows that a considerable amount of drug paraphernalia was present in the house. Schmidt testified that he found a digital scale in the living room and that digital scales could be used to measure narcotics before packaging them for distribution. Schmidt also found a book titled "The Pill Book" in the bedroom identified as belonging to George. The cover of "The

11

Pill Book" indicates that the book is a guide to the most commonly prescribed drugs in the United States. In the bedroom identified as belonging to Williams, Schmidt found a shoe box containing razor blades, small rubber bands, a plastic bag containing several smaller bags, and rolling papers. Schmidt testified that based on his training, education, and experience, he had knowledge that the razor blades could be used to scrape out exact amounts of narcotics and to scrape the narcotics into bags; the small rubber bands could be used to close the bags; the small bags could be used to hold crack cocaine or small amounts of powder cocaine; and the rolling papers could be used to roll marijuana cigarettes. In the room identified as Williams's bedroom, Schmidt found a compact-disc case containing razor blades and small bags. Officer James Stuart testified that he found a box of strawberry-flavored cigars in the room identified as Williams's bedroom and that based on his education, training, and experience, he had knowledge that flavored cigars were used to mix tobacco and marijuana.

Regarding the eleventh link—whether Williams owned or had the right to possess the house where the drugs were found—the evidence is conflicting. Williams's former girlfriend, Williams's friend, and Rodriguez testified that Williams was not living at the house where the drugs were found but was instead living with his former girlfriend when the incident occurred in February 2004. Rodriguez further testified that the house where the drugs were found belonged to Kamren Kizer, a woman he had dated. Rodriguez testified that the bedroom that the police had identified as Rodriguez's room was Kizer's room and that the other two bedrooms did not belong to anyone and were open for anyone's use.[3] Williams's friend testified that he hoped that no one

---

[3] At the time of trial, Rodriguez was serving time in prison as the result of a conviction for possession of cocaine. During the State's cross-examination of Rodriguez, Rodriguez also testified that he had previously been convicted of attempted aggravated assault, forgery, and another instance

lived in the house where the drugs were found because the house did not have a kitchen or working restroom.

On the other hand, several witnesses testified that Williams lived in the house where the drugs were found. The officer who arrested Williams, Officer James Davenport, testified that he knew that Williams lived in the house because he had observed Williams there between twenty and thirty times prior to the date of the arrest. Sergeant Stanley also testified that he knew Williams lived at the house where the drugs were found because he had observed Williams there "on a regular basis" and at least a dozen times before the date of the arrest. Officer Schmidt testified that Williams lived in the house and that Schmidt had personally observed Williams at the house on "many occasions" prior to the date of the arrest. Officer Stuart testified that he had conducted surveillance on the house prior to the date of the arrest and that he observed Williams to be living in the house. Stuart testified that on the night of the arrest, he observed Rodriguez telling Officer Schmidt the names of the people who resided in each of the bedrooms in the house and identifying Williams as the occupant of one of the bedrooms. In addition, Stanley testified that on the night of the arrest, Rodriguez's girlfriend led him through the house and gave him the names of the people residing in each of the three bedrooms, including identifying one of the bedrooms as belonging to Williams.

Further evidence also suggests that Williams lived in the house where the drugs were found. In the room that Schmidt and Stanley testified as having been identified as Williams's room, Schmidt found a driver's license and student-identification card identifying Williams.[4] In a shoe box

of possession of a controlled substance.

[4] The address listed on Williams's driver's license was not the address of the house where the drugs were found.

13

in the bedroom, officers found a letter written to Williams and several photos of Williams, including at least one that appeared to have been taken in that bedroom. Schmidt also testified that he recognized two pairs of tennis shoes found in the bedroom as shoes that he had seen Williams wear on previous occasions.

Regarding the twelfth link—whether the place where the drugs were found was enclosed—the evidence shows that the drugs were enclosed within the house. Evidence pertaining to the thirteenth link—whether Williams was found with a large amount of cash—shows that Williams was not found with cash on his person but that there was a considerable amount of cash found in the room identified as his bedroom and in the rest of the house. Officers found at least $1,480 in various places in the room identified as Williams's room. The total amount of cash found in the house was $3,019.64. Regarding the fourteenth and final link—whether Williams's conduct indicated a consciousness of guilt—there is no such evidence.

Considering all the evidence in a neutral light, and given that the jury was authorized to convict Williams under the law of parties, we conclude that the evidence supporting the convictions is not so weak or so against the great weight and preponderance of the evidence as to render the verdict manifestly unjust. Although the State did not establish all of the possible links between Williams and the controlled substances, it is the logical force of all the evidence that is dispositive, not the number of links. *See Figueroa*, 250 S.W.3d at 501. The record contains evidence that Williams was at the house where the drugs were found on the night of his arrest and that he lived in the house. Williams had been observed at the house on numerous occasions before the date of his arrest, and several items belonging to him were found in the room identified as his bedroom. In addition, photos taken of the room and admitted into evidence at trial show that the

14

room contained a bed with a mattress; an entertainment center with a television and stereo; clothes and baseball caps hanging on the wall; several pairs of shoes on the floor; and various other personal items that would generally be found in a bedroom. Although the record includes conflicting testimony about where Williams lived, the jury was the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Lancon*, 253 S.W.3d at 707.

In addition, the record includes evidence that cocaine, drug paraphernalia, and a large amount of cash ($1,480) were present in the room identified as Williams's bedroom and that a large array and quantity of controlled substances and drug paraphernalia were discovered in the house, including some in plain view. The record also contains no evidence showing that Williams was legitimately employed. Further, given that Williams was charged as a party, the jury was permitted to consider evidence of events occurring before the commission of the offense—such as the numerous times Williams was observed at the house before the date of his arrest—to establish that he participated as a party in the offense of possession with intent to deliver. *Salinas*, 163 S.W.3d at 739-40.

E.      **Conclusion Regarding Factual Sufficiency**

Considering all of the previously mentioned factors, we conclude that the evidence is factually sufficient to support Williams's convictions, and we therefore overrule Williams's sole issue.[5]

---

[5] As discussed in the next section of this opinion, we will modify one of the judgments but will affirm the judgment as modified.

15

***Errors in One of the Judgments***

In our own review of the record, this Court observed errors in one of the four judgments in this case. Specifically, in the judgment regarding Williams's conviction for possession of marijuana with intent to deliver, the trial court misidentified the offense and imposed a sentence that exceeds the maximum sentence authorized by law.

To begin with, the judgment convicts Williams of an offense that is not supported by legal authority. Although there is a statute establishing the offense of possession of marijuana, *see* Tex. Health & Safety Code Ann. § 481.121 (West 2010), and one establishing the offense of delivery of marijuana, *see* Tex. Health & Safety Code Ann. § 481.120 (West 2010), there is no statute establishing an offense for possession of marijuana with intent to deliver. We have also found no other legal authority establishing that such an offense exists in Texas.[6] Accordingly, the trial court erred in issuing a judgment convicting Williams of possession of marijuana with intent to deliver. However, because we have already determined that the evidence is factually sufficient to support a conviction for possession of marijuana, and because there is no evidence in the record that Williams delivered marijuana, we modify the judgment to reflect that the conviction was for the offense of possession of marijuana, not possession of marijuana with intent to deliver.

The trial court also erred in imposing a sentence that exceeds the maximum sentence authorized by law. In the judgment pertaining to Williams's conviction for possession of marijuana, the trial court indicated that the conviction was a third-degree felony. The charge on punishment

---

[6] Although there is no such offense in Texas, there is a federal offense of possession of marijuana with intent to distribute. *See* 21 U.S.C. §§ 812, 841(a)(1) (1999 & Supp. 2010).

16

instructed the jury as to the applicable punishment range for a third-degree felony—which is between two and ten years in prison and up to a $10,000 fine, *see* Tex. Penal Code Ann. § 12.34 (West Supp. 2009)—and the jury assessed punishment at ten years' imprisonment and a $10,000 fine. However, in order for Williams's crime to constitute a third-degree felony, the State would have had to prove that Williams possessed between five and fifty pounds of marijuana, *see* Tex. Health & Safety Code Ann. § 481.121(b)(4) (West 2010), and the record shows that the State alleged and proved only that Williams possessed 5.02 ounces of marijuana. Thus, Williams's conviction for possession of marijuana is a state-jail felony authorizing a punishment range of only 180 days to two years in prison and up to a $10,000 fine.[7] *See* Tex. Health & Safety Code Ann. § 481.121(b)(3) (offense is state-jail felony if amount of marijuana possessed is between four ounces and five pounds); Tex. Penal Code Ann. § 12.35 (West Supp. 2009).

Any court with jurisdiction may, on its own motion and at any time, notice and take action upon a void or illegal sentence. *See Mizell v. State*, 119 S.W.3d 804, 805 (Tex. Crim. App. 2003); *Baker v. State*, 278 S.W.3d 923, 926 (Tex. App.—Houston [14th Dist.] 2009, pet. ref'd). A sentence not authorized by law is void, *see Ex parte Pena*, 71 S.W.3d 336, 336 n.2 (Tex. Crim. App. 2002), and a sentence that is outside the maximum or minimum range of punishment is unauthorized by law and therefore illegal, *see Mizell*, 119 S.W.3d at 806.

---

[7] When we raised this issue with both parties, the State agreed that the conviction should have been for possession of marijuana, a state-jail felony, and thus conceded that the judgment was erroneous in characterizing the offense as a third-degree felony and in imposing punishment commensurate with a third-degree felony.

17

Because William's conviction for possession of marijuana was mischaracterized as a third-degree felony, we modify the judgment to reflect that the conviction is a state-jail felony, in violation of section 481.121(b)(3) of the Texas Health and Safety Code. As modified, we affirm the portion of the judgment finding guilt. Because the sentence imposed for Williams's conviction for possession of marijuana exceeded the maximum punishment authorized by law, we reverse the portion of the judgment imposing punishment and remand this cause to the trial court for a new punishment hearing as to that conviction only. *See* Tex. Code Crim. Proc. Ann. art. 44.29(b) (West Supp. 2009); *Donnell v. State*, 191 S.W.3d 864, 870 (Tex. App.—Waco 2006, no pet.); *Hernandez v. State*, 190 S.W.3d 856, 872 (Tex. App.—Corpus Christi 2006, no pet.).

## CONCLUSION

Given our conclusion that the evidence is factually sufficient to support Williams's convictions for possession of cocaine with intent to deliver (count one), possession of alprazolam with intent to deliver (count three), and possession of codeine with intent to deliver (count four), we affirm the judgments of the trial court pertaining to counts one, three, and four in their entirety. Because we have concluded that the trial court misidentified and mischaracterized Williams's conviction for possession of marijuana with intent to deliver, count two, we modify the judgment to reflect that: (1) the conviction was for the offense of possession of marijuana, not possession of marijuana with intent to deliver; (2) the conviction was in violation of section 481.121(b)(3) of the Texas Health and Safety Code, not section 481.121(b)(4) of the Texas Health and Safety Code; and (3) the offense is a state-jail felony, not a third-degree felony. Because we have concluded that the evidence is factually sufficient to support Williams's conviction for possession of marijuana, we

18

affirm, as modified, the portion of the judgment finding Williams guilty of possession of marijuana. Because we find error in the punishment portion of the judgment pertaining to Williams's conviction for possession of marijuana, we reverse the portion of the judgment imposing punishment, and we remand the cause to the trial court for a new punishment hearing on that conviction only.

_____

Diane M. Henson, Justice

Before Justices Patterson, Puryear and Henson

Affirmed in part; Modified and, as Modified, Affirmed in part; Reversed and Remanded in part

Filed:   September 10, 2010

Do Not Publish