Opinion issued February 24, 2011



In The

Court of
Appeals

For The

First District
of Texas

————————————

NOS. 01-09-00926-CR

         
01-09-00927-CR

———————————

Mark Allen Strange, Appellant

V.

The State of
Texas, Appellee



 



 

On Appeal from the 182nd District Court 

Harris County, Texas



Trial Court Case Nos. 1028067 & 1030104

 



 

MEMORANDUM OPINION

          A jury found appellant, Mark Allen
Strange, guilty of two offenses of misapplication of fiduciary property, and
the trial court assessed punishment at 15 years’ confinement for each offense,
to run concurrently.  On appeal,
appellant contends (1) the evidence is insufficient and (2) the trial court
erred by improperly ordering restitution. 
We modify the judgments and affirm as modified.

BACKGROUND

The Nature of Third-Party
Administrators

          Appellant, a former sales director
for several insurance companies, began working for a third-party administrator
in 1993.  A third-party administrator is
a company hired to administer an employer’s self-funded health plan.  In a self-funded health plan, the employer
collects premiums from its employees and often makes its own contribution to
the plan.  With these funds, the employer
opens a bank account at a bank of its choosing. 
The employer grants the third-party administrator the ability to write
checks on this account.  When an employee
visits a doctor, the doctor will send the bill to the third-party
administrator, who will then pay the doctor by writing a check on the
employer’s account.

          The third-party administrator keeps a
check registry that reflects the checks that it writes out of the employer’s
account.  The third-party administrator
sends this check registry to the employer on a regular basis so that the
employer can deposit funds into the account to cover the checks on the
registry.  The accounts on which the
third-party administrator writes the checks to the doctors are usually
“zero-based” accounts, which means that money is transferred into this account
from a separate operating account to cover the exact amount of checks reflected
on the check registry.

          The indictments in these cases alleged
that, in his role as a third-party administrator, appellant misapplied funds
from the McAllen Independent School District (“McAllen ISD”) and the
Association of Vineyard Churches, U.S.A. (“Vineyard”).

The McAllen ISD Case

          John Bryan, Bruce Margulis, and Ralph
Margulis owned a third-party administrator called Administrative Services of
North America (“ASO”).  Bryan and the
Margulises hired appellant as president and Chief Excutive Officer of ASO in
1997.  Appellant handled the day-to-day
operations of the business and was paid an annual salary of $150,000.

          McAllen ISD was a client of ASO and
had a contract for third-party administrative services while appellant was
ASO’s president.  Debbie Prukop, McAllen
ISD’s benefits coordinator, testified that ASO would send her a weekly check
registry showing all the medical claims that ASO had processed during the
previous week.  Prukop would send the
money necessary to pay these claims to a “claim-specific trust account,” which
was a zero-based account maintained solely to hold funds necessary to pay
McAllen ISD’s medical claims. 
Appellant’s signature, along with three others, was on this account’s
signature card.  Once McAllen ISD funded
this account in an amount necessary to pay claims on the weekly check registry,
ASO would mail the checks to the doctors who had submitted claims for treating
McAllen ISD employees.  Prukop testified
that the money McAllen ISD sent to this bank account was to be used only for
the payment of medical provider claims as shown on the check registry.

          During the school year, McAllen ISD
would place money in the account on a weekly basis to cover the claims shown on
the weekly check registry.  However,
during the winter holidays, the school district was closed for three weeks.
Prukop estimated the claims that would come in during this three week period to
be approximately $300,000, and she deposited that sum in the account on
December 18, 1998.  The purpose of
“pre-funding” the account was permit ASO to continue to pay physician’s claims
during the district’s three-week winter break.

          When Prukop returned to work in
January 1999, she learned that some of the doctor’s claims checks had been
returned for insufficient funds. 
Although Prukop had deposited sufficient funds to cover claims during
the three-week holiday, the account was empty. 
Prukop contacted Ken Wethe, a employee benefit consultant for the
district, to determine what she should do.

          Wethe contacted ASO, and appellant
told him that he would investigate the reasons for the bounced checks.  Appellant suggested that new procedures
adopted by ASO may have caused the problem. 
Wethe asked to see the bank records for McAllen ISD so that he could
determine how the $300,000 deposit had been used.  Appellant said that he would provide the bank
records, but he never did.  Wethe,
therefore, contacted the Texas Department of Insurance, and, with its
assistance, obtained the bank records he sought.  Wethe saw that several wire transfers had
been withdrawn from the account.  This
was unusual, because the only withdrawals should have been checks made out to
health care providers.  Wethe also
noticed some deposits into the accounts which did not come from McAllen ISD and
which he could not explain.  Wethe
noticed a pattern of deposits and withdrawals into the account over a period of
two months.  Wethe eventually was able to
calculate that McAllen ISD had suffered a net loss of over $300,000.  This amount represented money that was
withdrawn from the account but was not used to pay health care providers.

          Shirley Sheu was ASO’s corporate
controller during the time of these events. 
Sheu recalled that, at the time, ASO was performing poorly and was
unable to meet its payroll in December 1998.   
When Sheu told appellant about the situation, he instructed her to transfer
$258,000 from McAllen ISD’s account to ASO’s payroll account on December 30,
1998.  During the following months,
appellant had Sheu transfer money from McAllen ISD’s account to ASO’s on
several occasions.

          ASO’s owner, Bryan, learned of the
bounced checks on the McAllen ISD account and asked appellant about it.  Appellant told Bryan that Sheu had placed
some funds in the wrong account, which caused the McAllen ISD account to be
underfunded.  Bryan assumed that
appellant was going to move the money back to McAllen ISD’s account, but he
never did so.  Checks continued to bounce
on the McAllen ISD account.

          Bryan, who lived in New Jersey,
decided to visit Houston to investigate the situation.  He soon discovered that appellant had been
paying himself unauthorized $25,000 quarterly bonuses and buying unauthorized
purchases for himself with corporate money, so Bryan fired him.  One month later, in April 1999, ASO went out
of business.

          Bryan contacted the Department of
Labor and reported the problems at ASO.    The Department of Labor conducted an
investigation, and at its conclusion, appellant signed a “consent order and
agreement” with the Department.  Under
the terms of the consent order, appellant agreed not to act as a fiduciary for
any employee benefit plan for ten years. 
He also agreed not to exercise authority or control over the management
or disposition of the assets of any employee benefit plan or to be a signatory
to any bank account holding employee benefit plan assets.

          Appellant testified that he mistakenly
approved the transfer of $458,000 from McAllen ISD’s account to ASO accounts
because he believed that ASO’s money had been erroneously placed in McAllen
ISD’s account.  He later learned that his
information was not correct that the transferred funds had never belonged to
ASO.  He admitted on cross-examination
that, even though he thought that $458,000 of ASO’s money had been mistakenly
put in McAllen ISD’s account, he authorized the transfer of $641,000 from the
McAllen ISD account.

The Vineyard Case

          Almost two weeks after he was fired
from ASO, appellant met Don Marsh, and they began exploring the possibility of
purchasing a third-party administration. 
In 2001, Marsh and James Holtz formed a company, National
Administrators, Inc. (“NA”).  Appellant
was a 51 % owner of NA.  When NA was
unable to obtain a third-party administrator license from the State, NA
purchased another company, National Employee Benefit Administrators, Inc.
(“NEBA”), which already had a third-party administrator license and an existing
client base.

          Appellant, Marsh, and Holtz also owned
another company called Health Corp Group, Inc. (“HC”), and appellant was its
president and Chief Operating Officer. 
HC purchased National Health Care Administrators, Inc. (“NHA”), which was
not an operational company at the time, but which did hold a third-party
administrator license.  HC sold NHA to
Marsh and Holz, individually.  Appellant
was not an officer or director in NHA, but he was its manager.  NHA began doing business as a third-party
administrator, and the clients from NEBA, the subsidiary of HC, were
transferred to NHA.

          HC, NA, and NHA were in the same
office building in Houston.  Appellant
ran the office and made the day-to-day decisions for all three companies.  Marsh ran another NA office in Austin.

          Jane Hardesty was the employee
benefits plan administrator for Vineyard, an association of 650 churches.  When Hardesty was unable to obtain a
fully-funded health insurance plan for Vineyard employees, she decided to
consider a self-funded plan with a third-party administrator.  Appellant met with Hardesty and Gary Jurney,
a benefits broker, on several occasions and explained how self-funded plans
were put together.  Appellant said that
his company was NA, and he acted as if he owned it.  Appellant was the only person representing NA
at these meetings. Finally, appellant put together a proposal that he presented
to Vineyard’s national board.  The board
approved the proposal and entered an “administrative services agreement” with
NA.  The contract states that the
third-party administration would be NHA, doing business as NA.

          Don Marsh, rather than appellant,
signed the contract, presumably because appellant was not an officer or
director of NHA.  Appellant explained to
Hardesty that Marsh was NA’s president and that he would sign the claims check
that NA paid on Vineyard’s behalf to health care providers.

          Appellant set up the accounts for both
his companies and for Vineyard. 
Appellant told Gayle Wilson, an employee of Compass Bank, that he owned
HC and explained that the company administered health care benefits for several
clients.  Appellant told Wilson that he
wanted to open several bank accounts. 
The HC account would be the “parent account” and the NHA accounts and
client accounts, including Vineyard’s, would be under the “HC Umbrella.”  Appellant told Wilson that he wanted all the
accounts to be set up so that he could electronically transfer money between
all the accounts.  The accounts were set
up as appellant requested, and he was the only person who could access them.

          In January 2003, the checks that
appellant sent to health care providers on Vineyard employees’ behalf began to
bounce.  Hardesty testified that this
should not have happened because she fully funded the Vineyard account every
two weeks based on the check registry that appellant provided her.  Often, Hardesty personally hand delivered the
checks to appellant to be placed in Vineyard’s account.

          When Hardesty complained about the
bounced checks, appellant told her that the bank had made a mistake and placed
the money in the wrong account.  She
later learned this was not true. 
Vineyard continued to fund the account, but the checks continued to
bounce.  Hardesty had an audit conducted
and determined that $470,000 was missing from Vineyard’s account and had not
been used to pay health care providers.

          Appellant, the only person with access
to the accounts, had been transferring money out of Vineyard’s account into
other accounts, including NHA’s payroll account.  Appellant testified that, although he made
the transfers, he did so at Marsh’s direction. 
Marsh testified that he never told appellant to transfer money out of
client accounts into corporate accounts.

SUFFICIENCY OF THE EVIDENCE

          In points of error one through four,
appellant contends the evidence is legally and factually insufficient to show
(1) that he was a fiduciary for McAllen ISD or Vineyard, (2) that the
complainants, Prukop and Hardesty, were “persons for whose benefit the property
was held,” or (3) that any funds were misapplied.

Standard of Review

This Court now reviews both legal and factual sufficiency
challenges using the same standard of review. Ervin v.
State, No. 01-10-00054-CR,
2010 WL 4619329, at *2–4 (Tex. App.—Houston [1st Dist.] Nov. 10,
2010, pet. filed) (construing majority holding of Brooks v. State, 323
S.W.3d 893, 905, 912–13 (Tex. Crim. App. 2010)). Under this
standard, evidence is insufficient to support a conviction if, considering all
the record evidence in the light most favorable to the verdict, no rational
factfinder could have found that each essential element of the charged offense
was proven beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S.
307, 319, 99 S. Ct. 2781, 2789 (1979); In re Winship, 397 U.S. 358, 361,
90 S. Ct. 1068, 1071 (1970); Laster v. State, 275 S.W.3d 512, 517 (Tex. Crim.
App. 2009); Williams v. State, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).
Viewed in the light most favorable to the verdict, the evidence is insufficient
under this standard in two circumstances: (1) the record contains no evidence,
or merely a “modicum” of evidence, probative of an element of the offense; or
(2) the evidence conclusively establishes a reasonable doubt. See Jackson,
443 U .S. at 314, 318 n.11, 320, 99 S. Ct. at 2786, 2789 & n.11; Laster,
275 S.W.3d at 518; Williams, 235 S.W.3d at 750. Additionally, the
evidence is insufficient as a matter of law if the acts alleged do not
constitute the criminal offense charged. Williams, 235 S.W.3d at 750.

An appellate court determines whether
the necessary inferences are reasonable based upon the combined and cumulative
force of all the evidence when viewed in the light most favorable to the
verdict. See Clayton v. State, 235 S.W.3d 772, 778 (Tex. Crim. App .2007)
(citing Hooper v. State, 214 S.W.3d 9, 16–17
(Tex. Crim. App. 2007)).  In viewing the
record, direct and circumstantial evidence are treated equally; circumstantial
evidence is as probative as direct evidence in establishing the guilt of an
actor, and circumstantial evidence alone can be sufficient to establish guilt. Id.
(citing Hooper, 214 S.W.3d at 13). An appellate court presumes that the
factfinder resolved any conflicting inferences in favor of the verdict and
defers to that resolution. See Jackson, 443 U.S. at 326, 99 S. Ct. at
2793; Clayton, 235 S.W.3d at 778.  An appellate court also defers to the
factfinder’s evaluation of the credibility of the evidence and weight to give
the evidence. See Williams, 235 S.W.3d at 750.

Law Applicable to Misapplication of
Fiduciary Property

A person commits misapplication
of fiduciary
property if he misapplies property, held as a fiduciary, and such misapplication
involves a substantial risk of loss to the owner of the property or to a person
for whose benefit the property is held. See Tex. Penal Code Ann. § 32.45(a)–(b)
(Vernon Supp. 2009). “Misapply” means to deal with property contrary (1) to an
agreement under which the fiduciary holds the property; or (2) by law
prescribing the custody or disposition of the property. Id. §
32.45(a)(2).  The agreement need not be
written, but must merely be a harmonious understanding as to a course of
action.  Bynum v. State, 767
S.W.2d 769, 777 (Tex. Crim. App. 1989). “[A] fiduciary is one in whom another
has justifiably reposed confidence to act in a certain manner.” Talamantez
v. State, 790 S.W.2d 33, 35 (Tex. App.—San Antonio 1990, pet. ref'd); see
also Coplin v. State, 585 S.W.2d 734, 735 (Tex. Crim. App. 1979) (holding
that fiduciary capacity includes joint adventurers, partners and other
fiduciary relationships not specifically mentioned in the statute).  The Insurance Code provides the
following regarding third-party administrators:

          (a) an administrator holds in a
fiduciary capacity:

(1) a premium or
contribution the administrator collects on behalf of an insurer, plan, or plan
sponsor[.]

 

Tex. Ins. Code
Ann. § 4151.106(b) (Vernon 2009).

 

The Vineyard Case

          Appellant contends that there is
insufficient evidence to show that he held money for Vineyard “in a fiduciary
capacity.”  Specifically, appellant
argues that he did not sign the contract with Vineyard, Marsh did.  Thus, appellant argues, Marsh owed the fiduciary
duty, not him.  Appellant also argues
that there is a lack of any written documentation that he agreed to act in a
fiduciary capacity.  We disagree.

          That someone other than appellant
signed the contract is irrelevant because appellant acted as a fiduciary
pursuant to that contract in his capacity as the employee of the third-party
administrator charged with holding premium contributions for payment to medical
providers.  See Coleman v. State, 131 S.W.3d 303, 308 (Tex. App.—Corpus Christi
2004, pet. ref’d); Manges v. Guerra,
673 S.W.2d 180, 183 (Tex. 1984) (holding in civil context that fiduciary duty
arises from relationship, not contract). 
That agreement is “written documentation” that authorized appellant to
hold the property as a fiduciary and gave rise to a “harmonious understanding”
between the parties as to a course of action regarding the property.  Bynum,
767 S.W.2d at 777; Anderson v. State,
322 S.W.3d 401, 406 (Tex. App.—Houston [14th Dist.]
2010, no pet.).  Here, appellant devised the health care plan
in question and presented it to Vineyard’s board.  He alone negotiated the contract on the
company’s behalf.  Appellant was the only
contact that Hardesty had with NA. 
Appellant set up the financial accounts for both his companies and his
clients, including Vineyard.  He alone
managed these accounts and had access to transfer money between the
accounts.  Hardesty gave money to
appellant for the purpose of funding Vineyard’s account so that its employees’
healthcare providers could be paid.  The
checks written to healthcare providers on Vineyard’s account bounced, despite
the account having been properly funded by Hardesty.  Appellant, who was the only person with electronic
access to both the Vineyard account and the corporate accounts, transferred
money from the Vineyard account to the corporate accounts, leaving no funds
with which to pay Vineyard’s employees’ healthcare providers.  From this evidence a reasonable jury could
have formed a firm belief or conviction that appellant dealt with property
contrary to an agreement with Vineyard concerning the property.  See
Marin v. IESI TX Corp., 317 S.W.3d 314, 330 (Tex. App.—Houston [1st Dist.]
2010, pet. filed) (holding evidence legally sufficient to support finding
beyond reasonable doubt that defendant misapplied fiduciary property by
depositing funds tendered for payment to one company’s account into another
company’s account that she also controlled).

          Appellant also contends that there is
insufficient evidence to show that Hardesty and Vineyard are “persons for whose
benefit the property [was] held.”  A
fiduciary commits an offense when he misapplies property that involves a
substantial risk of loss to “a person for whose benefit the property is held.” Tex. Penal Code Ann. § 32.45(b)
(Vernon Supp. 2010).  “‘Benefit’ means
anything reasonable regarded as economic gain or advantage, including benefit to any other person in
whose welfare the beneficiary is interested.” Tex. Penal Code Ann. § 1.07(7) (Vernon
Supp. 2010).  

            Appellant
argues that he held the money for the benefit of the healthcare providers, not
Hardesty or Vineyard.  The Vineyard
account, in this case, was an employee benefit provided to Vineyard employees,
including Hardesty.  The purpose of this
account was to hold funds collected as premiums to pay the debts that Vineyard
employees owed to the healthcare providers. 
By diverting the money from Vineyard’s account, appellant deprived
Vineyard and its employees of their premium contributions and their debts went
unpaid.  A reasonable jury could have
concluded beyond a reasonable doubt that the money in the account was held for
the benefit of Hardesty and Vineyard.

            We
overrule points of error one and two.

 

The McAllen ISD Case

          In points of error three and four,
appellant challenges the sufficiency of the evidence in the McAllen ISD
case.  Appellant makes the same arguments
as that in the Vineyard case. 
Specifically, appellant contends that “[n]o evidence was presented that
he entered into any agreement with McAllen or that he was using the funds in
violation of that agreement.”  We
disagree.

          Again, it is irrelevant that appellant
did not sign the contract that provides written documentation of the agreement because
appellant’s relationship as an employee of the administrator charged with the
responsibility of holding the funds is evidence supporting his status as a
fiduciary. Here, Prukop, McAllen ISD’s benefits coordinator, testified that
appellant would send her a weekly check registry showing all the medical claims
that ASO had processed during the previous week.  Prukop would then send the money necessary to
pay these claims to a “claim-specific trust account,” to hold funds necessary
for ASO to pay McAllen ISD’s medical claims. 
Prukop testified that the money McAllen ISD sent to this bank account
was to be used only for the payment of medical provider claims as shown on the
check registry.  Sheu, ASO’s corporate
controller, testified that appellant instructed her to transfer $258,000 from
McAllen ISD’s account to ASO’s payroll account. 
Thereafter, appellant had Sheu transfer money from McAllen ISD’s account
to ASO’s on several other occasions.

          From this evidence a reasonable juror
could have formed a firm belief or conviction that appellant dealt with
property contrary to an agreement with McAllen ISD concerning the
property.  See Marin, 317 S.W.3d at 330 (holding evidence legally sufficient
to support finding beyond reasonable doubt that defendant misapplied fiduciary
property by depositing funds tendered for payment to one company’s account into
another company’s account that she also controlled).

          We overrule points of error three and
four.

RESTITUTION

          In his fifth issue, appellant
contends the trial court violated appellant’s due process rights by entering
improper restitution orders.  At the
conclusion of the punishment hearing, the trial court assessed punishment at 15
years’ confinement in each case and stated on the record that she would “make a
notation of judgment for restitution.” 
Each case contained a judgment addendum in which the trial court found
“that the parole board should require the Defendant to make restitution . . .
as a condition of parole.” 

  Oral
Pronouncement

          Appellant first contends that the
restitution orders are invalid because they were not pronounced in his
presence.  It is true that a defendant’s
sentence must be pronounced in his presence. 
Tex. Code Crim. Proc. Ann.
art.  42.03 § 1(a) (Vernon Supp.
2010).  The sentence is part of the judgment
that orders that the punishment be carried into execution in the manner
prescribed by law.  Tex. Code Crim. Proc. Ann. art.  42.02 (Vernon Supp. 2010).  

            If
a court orders restitution in the judgment, it is punishment.  See
Weir v. State, 278 S.W.3d 364, 366 (Tex. Crim. App. 2009); see also Tex. Code Crim. Proc. Ann. art. 42.037 (Vernon 2006) (permitting
trial court to order restitution).  A
trial court may also recommend
restitution as a condition of parole, which is what occurred in these cases.  See
Figueroa v. State, 250 S.W.3d 490, 516 (Tex. App.—Austin 2008, pet. ref’d);
McNeill v. State, 991 S.W.2d 300, 302
(Tex. App.—Houston [1st Dist.] 1999, pet. ref’d, untimely filed).  When the trial court recommends restitution
as a condition of parole, but does not order it in the judgment, the trial
court need not pronounce it in the defendant’s presence.  See
Massey v. State, No. 01-02-00839-CR, 2004 WL 1688559, *1 (Tex. App.—Houston
[1st Dist.] July 29, 2004 (pet. ref’d) (not designated for publication)
(holding that recommending restitution as condition of parole is not a part of
judgment), see also Tolar v. State, No.
02-10-00033-CR, 2010 WL 5186799, at *1 (Tex. App.—Waco Dec. 23, 2010, no pet.) (not
designated for publication) (holding trial court erred by ordering restitution
in judgment when oral pronouncement did not include restitution).  Here, the trial court recommended restitution
as a condition of parole, but it did not order restitution.  Therefore, the trial court did not err by not
pronouncing the restitution recommendation in appellant’s presence.

The McAllen ISD Case

In the McAllen ISD case, the judgment contained two
addenda.  The first addendum checked a
box marked as follows:  “The Court finds
that the parole board should require the Defendant to make restitution in the
amount of $337,000 to be paid to McAllen Independent School District as a
condition of parole.”  The second
addendum checked this same box and duplicated this information, but also
checked a second box ordering appellant to pay $807,000 in restitution to
ASO/Vineyard.  The words “ASO/Vineyard”
were effaced.  The second addendum also
stated that appellant was convicted under Chapter 20 or sections 25.03, 25.031,
or 25.04 of the Penal Code and directing restitution for the medical and
psychiatric care of a victim under the age of 17.

          Appellant contends that the second
addendum in the McAllen ISD case is erroneous because it (1) orders restitution
to the wrong victim, “ASO/Vineyard,” (2) it sets restitution at $807,000, an
amount unsupported by the record, and (3) it references penal statutes that do
not apply to appellant’s case.

          The State concedes that the second
addendum is incorrect because it orders restitution to “ASO/Vineyard,” not McAllen
ISD, the correct amount of restitution to McAllen ISD is $337,000, and that the
penal statutes referenced are not applicable. The second addendum also
duplicates information found in the first addendum.  Accordingly, we reform the judgment to delete
the second addendum in the McAllen ISD case. 
See Tex. R. App. P. 43.2(b) (appellate court may modify trial
court’s judgment and affirm as modified).

          Appellant also contends that the amount
of restitution recommended by the trial court in the first addendum is not
supported by the evidence.  We review
such a challenge under an abuse of discretion standard. Cartwright v. State,
605 S.W.2d 287, 288–89 (Tex. Crim. App. [Panel Op.] 1980); Lemos
v. State, 27 S.W.3d 42, 45 (Tex. App.—San
Antonio 2000, pet. ref’d). The court abuses its discretion when it acts in an
arbitrary or unreasonable manner. Montgomery v. State, 810 S.W.2d 372,
380 (Tex. Crim. App. 1990) (op. on reh’g). 
The amount of restitution must be just, and it must have a factual basis
within the loss of the victim.  See
Cartwright, 605 S.W.2d at 289 (holding that due process requires that
evidence in the record must exist to show that the amount has a factual basis).

          In the McAllen ISD case, the trial
court recommended restitution in the amount of $337,000.  Appellant argues that there was testimony
that some of the money had been returned. 
The record shows that in addition to unauthorized withdrawals, appellant
also made unauthorized deposits to McAllen ISD’s account.  However, Ken Wethe, McAllen ISD’s insurance
consultant testified that he calculated that the district had suffered a net
loss of $334,230.  Bryan Vaclavik, a
fraud examiner hired the Harris County District Attorney’s office testified
that he calculated the district’s loss to be $337,000. Thus, there is a factual
basis in the record to support the restitution recommended in the McAllen ISD
case.

The Vineyard Case

          In the Vineyard case, the judgment
also contained two addenda.  The first
addendum checked a box marked as follows: “The Court finds that the parole
board should require the Defendant to make restitution in the amount of
$470,000 to be paid to Association of Vineyard Church, USA as a condition of
parole.”  The second addendum did not
check this box, but instead checked another ordering appellant to pay $837,000
in restitution to ASO/Vineyard.  The
second addendum also states that appellant was convicted under Chapter 20 or
sections 25.03, 25.031, or 25.04 of the Penal Code and directing restitution
for the medical and psychiatric care of a victim under the age of 17.

          The State concedes that “[i]nsofar as
this second addendum is fraught with errors it should be deleted[.]”  We agree. 
Accordingly, we
reform the judgment to delete the second addendum in the Vineyard case.  See
Tex. R. App. P. 43.2(b)
(appellate court may modify trial court’s judgment and affirm as modified).

Appellant also contends that the amount of restitution
recommended by the trial court in the first addendum is not supported by the
evidence.  We review such a challenge
under an abuse of discretion standard. Cartwright, 605 S.W.2d at 288–89; Lemos, 27 S.W.3d at 45. The court abuses its
discretion when it acts in an arbitrary or unreasonable manner. Montgomery,
810 S.W.2d at 380.  The amount of
restitution must be just, and it must have a factual basis within the loss of
the victim.  See Cartwright, 605
S.W.2d at 289.

          In the Vineyard case, the trial court
recommended restitution in the amount of $470,000.   Gary Jurney, a consultant hired by the
Vineyard, and Randy Reimer, an accountant hired by the Vineyard to conduct an
audit of their accounts, testified that $470,000 was missing from Vineyard’s account.  Thus, there is a factual basis in the record
to support the restitution recommended in the Vineyard case.

          We sustain appellant’s point of error
five as to the second addendum to each judgment, and modify the judgments to
delete the second addendum to each case. 
We overrule point of error five in all other respects.

CONCLUSION

          We modify the judgments to delete the
second addendum in each case.  As
hereinabove modified, we affirm the judgments of the trial court.

 

 





 

                                                                   Sherry
Radack

                                                                   Chief
Justice 

 

Panel
consists of Chief Justice Radack and Justices Alcala and Bland.

Do
not publish.   Tex. R. App. P. 47.2(b).